**Joy MORRILL, Plaintiff,**

v.

**Manuel LUJAN, et al., Defendants.**

**Civ. A. No. 92–0216–B–S.**

United States District Court,
S.D. Alabama, S.D.

Sept. 28, 1992.

Henry H. Caddell, Thiry & Caddell, Mobile, Ala., for plaintiff.

Richard A. Horder, Attorney for DeWeese, Kilpatrick & Cody, Atlanta, Ga., Charles Brooks, Dept. of Justice, Environment and Natural Resources Div., Washington, D.C. (John Harrington, Regional Sol., U.S. Fish & Wildlife Service, Atlanta, Ga., Michael Hirsch, Office of Gen. Counsel, Federal Emergency Management Agency, Washington, D.C., of counsel), for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUTLER, District Judge.

**" . . . (A)dvice and law are not the same."[1]**

---

Like Stuart Little, the little mouse born to human parents in E.B. White's children's classic, the Perdido Key beach mouse faces many of the same perils Stuart did: House cats (Snowbell), domestic mice (Stuart's parents' fears that he would venture down a mouse hole), and the human threat (of having his tail cut off by a farmer's wife with a carving knife). In the end, Stuart did what the endangered Perdido Key Beach mouse did in this case to cause the origins of this litigation, "traveling north until [as the Plaintiff contends] the end of my days."

### FINDINGS OF FACT

When the Perdido Key Beach mouse moved north across Highway 182 at Florida Point on Perdido Key, it ventured out of its federally designated critical habitat of some 88 acres, into an area comprising approximately 75 acres, of which the defendant Dewitt DeWeese owns the westernmost 8.3 acres, or 11% (see Plaintiff's Exhibit 1). DeWeese began construction of a lounge (the first phase of a lounge/restaurant/hotel complex), by leveling half an acre of his land in December of 1990 and the balance of the 8.3 acres in October 1991. When the plaintiff, Joy Morrill, filed her application for a temporary restraining order and preliminary injunction, the defendant consented to a cessation of his operations to allow this matter to be heard by this Court *ore tenus* on August 27–28, 1992.

The plaintiff, Dr. Joy Morrill, holds a Ph.D. in Marine Biology, specializing in Marine Botany. She resides in Orange Beach, Alabama, only a few miles from Gulf State

---

1. Stuart Little, E.B. White, Harper & Brothers, 1945, p. 93.

Park and the DeWeese property. Dr. Morrill visits the park several times a week to gather information for her study of the beach mouse habitat and the process of dune building. According to Dr. Morrill, the beach mouse serves as an inadvertent engineer of dunes by burying seeds for sea oats and other grasses which, in turn, serve as the basis for the formation of dunes.

The thrust of the plaintiff's position is that the development has threatened the continued existence of the Perdido Key Beach mouse, by an actual "taking" of the Perdido Key Beach mouse in violation of Section 9 of the Endangered Species Act, caused by the effect that the development will have on its habitat north of the road, as well as on the critical habitat south of the road, primarily from the increase in the risk of human disturbance and the introduction of house/feral cats and house mice, ultimately threatening the extinction of the species itself.

Against this backdrop one must look to the history of the mouse itself and the area of concern. The Perdido Key Beach mouse is a subspecies of the old field mouse which is found throughout the Southeastern United States in a number of varieties. The Perdido Key Beach mouse once was thought to have occupied much of Perdido Key, a thin barrier key or island separating the Gulf of Mexico from the inland waters of Florida and Alabama bounded on the east by Pensacola Bay in Florida and the west by Perdido Pass in Alabama. The DeWeese property is located on the very northwestern tip of the west end of Perdido Key at Perdido Pass and is north of Highway 182 which runs east and west along the Key. Hurricane Frederic, which struck the Alabama coast at Mobile in September of 1979 is thought to have extirpated the beach mouse from all of its Perdido Key habitat, except the very western tip at

Gulf State Park (owned by the State of Alabama) south of Highway 182, sometimes called Florida Point, (even though it is actually in Alabama). In fact, at the time the Perdido Key Beach mouse was Federally listed as endangered (in 1985), the acting regional director of the Fish and Wildlife Service reported that "the Gulf State Park land in Florida Point and south of Highway 182 was the only habitat in Alabama considered suitable for occupation by the Perdido Key Beach mouse. (Plaintiff's Exhibit 60, p. 4)[2]

The DeWeese property was utilized by the U.S. Army Corps of Engineers as a dredge spoil site from 1968 to 1976 (Plaintiff's Exhibit 64) and when left undisturbed began to develop dunes and grasses making it more likely Perdido Key Beach mouse habitat. Although not a mirror image of the property north of Highway 182, Gulf State Park has the primary dune line on the Gulf beach that is so important to the beach mouse's survival.

When the State of Alabama replaced the Highway 182 bridge at Perdido Pass, it did so north of the then existing Highway 182 bridge and substantially disturbed the southern portion of what is now the DeWeese property with its construction equipment and bridge approaches (See Defendant's Exhibit R), and also by the unexplained appearance of large borrow pits criss-crossing a portion of DeWeese's property.

In 1984 the Alabama State Highway Department commissioned a study by Dr. Dan C. Holliman to determine the presence of the Perdido Key Beach mouse (which was then listed as an Alabama endangered species) north of Highway 182 in the area of the new bridge at Perdido Pass. Dr. Holliman studied the site and reported that in 1982 he had found no beach mice on what is now the DeWeese property; and that when he examined the site in June of 1984

---

**2.** The plaintiff make much of a single Perdido Key Beach mouse being reportedly located by Dr. Holliman north of Highway 182 in 1984 (see Defendant's Exhibit E, page 4). The finding quoted above by the Fish and Wildlife Service lays to rest any suggestion that there is any evidence to find that the DeWeese property might have supported any beach mouse population prior to 1985, and as further evidence shows prior to the spring of 1988 when Dr. N.R. Holler (Plaintiff's expert witness at trial) trapped two beach mice east of the DeWeese property.

found that it was "not prime beach mouse habitat" and in fact was "of poor quality", and "of no importance to beach mouse", the topography having been "severely altered by sand removal, ditching and erosion." (Defendant's Exhibit E) Although he reports trapping one mature male on June 12th, 1984, it cannot be ascertained whether that was on the DeWeese property or not, and in any event, he finds it of little or no significance due to the poor quality of the habitat.

Holler, to a large degree, confirms that this situation still existed when he visited the area on August 11, 1988 to study the effects of the widening of Highway 182. He found the widening would have "minimal effect" on the beach mouse habitat and "population impacts associated with (the widening) cannot be determined" (Defendant's Exhibit F).

In 1982, Myers had captured 13 beach mice in Gulf State Park south of Highway 182, but none on the eastern end of Perdido Key at the Gulf Islands National Seashore, an area approximately seven miles long on the Florida end of Perdido Key. (Plaintiff's Exhibit 23). A recovery and re-establishment plan was recommended by the Fish and Wildlife Service in August of 1987 (Plaintiff's Exhibit 23). This was implemented between 1986 and 1989 because the Florida Point site in Alabama offered a limited habitat along the primary beach dunes bounded on the west by Perdido Pass and the east by three condominiums; and more significantly *"there was no opportunity for immigration of the population into new areas of suitable habitat. Population expansion could only take place in the small areas of marginal habitat lying north of the primary dunes."* (Emphasis added). The trial testimony established that the area lying between the primary beach dunes and Highway 182 referred to in Holler's report as the area to the "north of the primary dunes", was south of Highway 182, not north of it where DeWeese's property is located. It was not until the spring of 1988 that Dr. Holler actually trapped the Perdido Key Beach mouse north of Highway 182, but in an area east of the DeWeese property.

The importance of the recovery plan's implementation to the Court's finding is the fact that even though the Gulf State Park habitat was primarily on the waterfront dune line, that the population was thought to be viable enough to actually trap mice and transport them eastward to restock the Gulf Islands National Seashore area at the east end of Perdido Key. Trapping began in April of 1986 and by April of 1987 the Gulf State Park population had shown a "dramatic increase", even though between April of 1986 and April of 1988 fifteen pairs of mice were moved from Gulf State Park to the National Seashore to the east. The existence of these two separate populations "provides some protection against total loss due to storms" (See Plaintiff's Exhibit 60). In addition to furnishing the restocking of mice, Gulf State Park south of Highway 182 has furnished, and continues to furnish, breeding pairs of mice that Dr. Holler and his staff maintain at Auburn University in an effort to uphold and preserve a large enough population of Perdido Key Beach mice that if something causes their wild population to be decimated, they could be restocked from this source. As of April 7th, 1992 some 70% of the captive colony had been killed in the lab (called "sacrificing") rather than reintroducing them in the wild. The survivors are used to continue the breeding stock, with periodic replenishing of the captive population with breeding pairs trapped in the wild. Dr. Holler was asked why there had been no restocking or transferring of mice from either Gulf State Park or Gulf Islands National Seashore to the Perdido Key State Recreational Area (an area about two miles long which is located in the middle of Perdido Key and which is Perdido Key Beach mouse habitat, but has no wild population of beach mice). He said that he had recommended that, but he would need the approval of the Florida Department of Natural Resources, and there would be additional expenditures of monies required for monitoring in addition to his time and effort.

At trial, Dr. Holler testified that the Perdido Key Beach mouse population is now in

"pretty good shape"[3] as long as there were no natural catastrophic occurrences to disturb it, such as a hurricane destroying its habitat or a decline in the breeding cycle. He also stated that if the DeWeese project went forward it "would jeopardize the continued existence of the mouse." Holler's trial opinion that the DeWeese project "would" jeopardize the existence of the mouse, must first be tempered by the extrinsic evidence beginning with his published opinion in January of 1991 (Plaintiff's Exhibit 24)[4] that development of the land north of Highway 182 "could be detrimental." (page 22). There is a substantial difference between something that could be detrimental to a species than that which would jeopardize its existence.[5]

What is clear to the Court is that the Perdido Key Beach mouse population as it exists south of Highway 182 in Gulf State Park today, existed there before Hurricane Frederick in 1979, when it didn't exist north of Highway 182; after the hurricane, when it didn't exist to the north; and has existed and thrived in Gulf State Park during the new bridge construction, when in 1984 Dr. Holliman found the area north to be of "no importance" to the mouse, and has continued to survive since DeWeese began clearing his property in December of 1990.

When DeWeese originally applied for a Corps of Engineers permit to construct a bulkhead and pier in conjunction with his project (he has since withdrawn these plans), the Corps and the Alabama Department of Environmental Management jointly issued a public notice dated November 14, 1990 stating that a preliminary review indicated that the project would not affect any endangered species. The notice did require consultation with the Fish and Wildlife Service as the Perdido Key Beach mouse was "in the vicinity". When the Service learned that DeWeese had commenced earth moving on the property, it requested he cease, and he did so immediately on December 14, 1990. Various meetings between DeWeese, Fish and Wildlife Service, and the Corps of Engineers followed and in February, the Corps requested final Section 7 consultation begin and again reiterated its feelings that "impacts to the Perdido Key Beach mouse would only occur if mice inhabit the area within the project boundaries" (Plaintiff's Exhibit 60). Further meetings of all the parties followed resulting, first in a draft opinion (Defendant's Exhibit K), then in the Fish and Wildlife Service's final jeopardy opinion of July 24, 1992, (Plaintiff's Exhibit 60). Much of this latter opinion is based on Holler's findings and personal communications with its author, Warren T. Olds, Jr. Many of the opinions expressed by Holler at trial are the same opinions relied upon by the jeopardy opinion. In fact, it is fair to say, that without Holler's findings and opinions as expressed in the jeopardy opinion, the opinion would not have reached the conclusions it did.

The draft opinion had proposed "reasonable and prudent alternatives (which) would avoid likelihood of jeopardizing the continued existence of the" beach mouse. It suggested that DeWeese, among other things, purchase the remaining 21.5 acres of privately-owned property and deed it to the State "for preservation and management as habitat for the Perdido Key Beach mouse". The effect of this is that the Fish and Wildlife Service was finding that if that additional habitat was secured from development, that the beach mouse could survive on the remaining acreage.

On August 23, 1991, DeWeese withdrew his Corps permit application and modified his project plans and, as stated earlier, finished clearing the site in October, 1991. John Crowder, former Chief of Fish and Wildlife Service's Permit and License

---

**3.** This quote is from the Court's bench notes as a trial transcript was not available at the time this opinion was written.

**4.** Holler and Rave, *Status of Endangered Beach Mouse Population in Alabama*, Journal of the Alabama Academy of Sciences, Vol. 2, No. 1.

**5.** Plaintiff argues that the law makes no such distinction, but this will be discussed later herein.

Branch, was retained by DeWeese to inspect his property on October 14–15, 1991 and found no evidence of beach mouse activity on the DeWeese property (Defendant's Exhibit Q).

### CONCLUSIONS OF LAW

█ Normally, the Court may grant a preliminary injunction only if a plaintiff proves the following criteria by a preponderance of the evidence: (1) a substantial likelihood of success on the merits, (2) irreparable injury, (3) the threatened injury to movant outweighs the potential harm to the other parties and (4) the injunction would not be adverse to the public interest. *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1561–62 (11th Cir.1989). Because this case arises under the Endangered Species Act, ("ESA"), plaintiff contends that the three latter elements are presumed and that she need only prove that she has a substantial likelihood of success on the merits. Before addressing the merits of the plaintiff's claim, however, the Court must address defendant's jurisdictional challenge to plaintiff's standing.

### Standing

█ Although defendant raises a challenge to plaintiff's standing to bring this action, if this plaintiff has not proved standing, it would seem impossible for any plaintiff to do so. Plaintiff brings this action as a citizen suit to enforce the provisions of the ESA. 16 U.S.C. § 1540(g). Even though the statute gives citizens the right to bring suit to enforce its provisions, plaintiffs who do so must nevertheless satisfy the elements necessary for standing: (1) actual or imminent injury-in-fact, (2) a causal connection between the injury and the conduct complaint of, that is, the injury must be " 'fairly traceable to the challenged action' " and (3) the injury is likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife,* —— U.S. ——,

——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976)).

Plaintiff has adduced sufficient evidence as to all of these elements. Dr. Morrill's current research involves the beach mouse habitat at Florida Point. Because the beach mouse plays a part in the propagation of sea oats and the formation of dunes by burying seeds, any harm to the beach mouse would be likely to result in harm to sea oats and dune formation, and harm to Dr. Morrill's research. Consequently, any ruling that would prevent harm to the beach mouse would prevent harm to Dr. Morrill's study.

### Preliminary Injunction

Plaintiff argues that by enacting the ESA Congress has made a presumption in favor of the species as to irreparable injury and as to any equitable considerations. There is considerable support for plaintiff's argument in *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), and *Sierra Club v. Marsh,* 816 F.2d 1376, 1383–84 (9th Cir.1987). After hearing the evidence presented by the parties, the Court finds it unnecessary to resolve this issue because plaintiff has failed to prove the element essential under either test, that is, a substantial likelihood of success on the merits.[6] Plaintiff contends that DeWeese's project should be enjoined for two reasons: (1) because the project constitutes a "taking" of an endangered species which is prohibited under Section 9 of the ESA and (2) because the project interferes with her Section 7 claim against the Secretary of the Interior in which she seeks to force the Secretary to adopt a recovery plan which designates as critical habitat all land north of Highway 182, including the DeWeese property.

6. Plaintiff moved to consolidate the trial on the merits with the hearing on the motion for preliminary injunction. The Court conditionally granted that motion preserving defendant's right to present additional testimony. Since plaintiff presented all her evidence on this issue

at the hearing, the Court finds that plaintiff not only has failed to prove a substantial likelihood of success on the merits but also has failed to prove an essential element of her claim, *i.e.,* a "taking" within the meaning of § 9 of the ESA.

In order to succeed on the merits of her first claim, plaintiff must prove that defendant DeWeese's project will constitute a "taking" of the Perdido Key beach mouse. Section 9 of the ESA makes it unlawful to take any species listed as endangered. 16 U.S.C. § 1538(a)(1)(B). The Act defines "take" as "to harass, harm pursue, hunt, shoot, wound, kill, trap, capture or collect or to attempt to engage in such conduct." 16 U.S.C. § 1532(19). The Secretary of the Interior has promulgated regulations which further define these terms. Harass is defined as:

> An intentional or negligent act which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1991). Harm is defined as:

> [A]n act which actually kills or injures wildlife. Such act may include significant habitat degradation or modification where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding or sheltering.

*Id.*

Plaintiff's argument and evidence point to three ways in which DeWeese's project might harass or harm the Perdido Key beach mouse: (1) the construction might actually kill or injure beach mice located on the DeWeese property, (2) the project might degrade or modify beach mouse habitat located on the DeWeese property or (3) the construction and completed project may lead to the influx of house mice, feral and house cats and human foot traffic on critical beach mouse habitat south of Highway 182 which will degrade and modify this critical habitat to such an extent that it will threaten the existence of the beach mouse. After much consideration, the Court finds that plaintiff's evidence simply does not support any of these theories.

The first theory is easily discredited because there is no conclusive evidence that the beach mouse has ever existed on the DeWeese property. The evidence presented by plaintiff on this point is extremely sketchy. In a 1982 study, Dr. Holliman reported no beach mice on what is now the DeWeese property. Although Holliman reported trapping one mouse north of the road in 1984, it is impossible to determine whether this mouse was on the DeWeese property. Finally, Dr. Holler reported sighting mouse tracks on the DeWeese property in 1988. However, even Dr. Holler could not state conclusively that these were Perdido Key beach mouse tracks. Furthermore, Dr. Holler was tracking north of the road across various parcels of property where the property lines were not marked. A tracking line drawn by Dr. Holler indicates that the tracks were found just inside the DeWeese property. Since the property lines were not marked, this evidence is not sufficient to establish that the tracks were actually on the DeWeese property.

Next, plaintiff has offered some evidence that at least part of the DeWeese property is suitable beach mouse habitat and thus the project would result in habitat modification or degradation. However, habitat modification or degradation alone is not enough. *Palila v. Hawaii Department of Human Resources*, 649 F.Supp. 1070 (D.Ha.1996). There must be some proof of "the critical link between habitat modification and injury to the species." *Id.* at 1077. Plaintiff's only proof as to this link between habitat modification and injury is dependent upon plaintiff's assertion that the beach mouse exists on DeWeese's property. For the reasons stated above, the Court finds that plaintiff's evidence is insufficient in this regard. Moreover, even if the beach mouse did exist on the relatively small area of suitable habitat found on DeWeese's property, there is no substantial evidence that the destruction of this habitat could threaten the species.

Finally, plaintiff's primary theory of harm is that the DeWeese's completed project will lead to the introduction of house mice, feral and house cats and human foot traffic on the critical habitat south of the road, the combination of which will threaten the continued existence of the species.

Dr. Holler testified that the combination of these factors would eventually lead to the extinction of the Perdido Key beach mouse. While the Court credits Dr. Holler's expertise with respect to the beach mouse, it finds that the assumptions underlying Dr. Holler's opinion are flawed.

First, studies of the effects of the house mouse and cats on the beach mouse are inconclusive. Although the evidence showed that in some places the beach mouse was displaced by the house mouse, in others the two coexist. Moreover, when the beach mouse has been displaced by the house mouse, there is no conclusive evidence of a cause-and-effect relationship. Importantly, beach mice and house mice coexist on the eastern end of Gulf State Park.

Cats, on the other hand, are natural predators of mice which logically might pose a threat to the beach mouse. However, acceptance of Dr. Holler's assumption that the DeWeese project would lead to the introduction of a significant number of cats to the area takes an incredible leap of logic. Dr. Holler theorizes that as people come to the area to vacation they will bring, and some will leave, their cats. As support he cites his observations in Grayton Beach, Florida, where the cat population dramatically increased after the summer tourist season. While this might be true for a residential community, common sense dictates that the DeWeese project is not the type where people would be likely to bring their cats. Currently under construction is a lounge. There are plans for a restaurant and a hotel. Although an occasional guest might attempt to take his pet to a hotel, even one which may have a "no pets" policy, the likelihood of such a person then abandoning his pet at the beach is minimal.

Dr. Holler's final assumption is that the construction of the hotel, restaurant, lounge and, most importantly, the parking lot, will lead to an increased utilization of the public beach at Gulf State Park. In turn, Dr. Holler theorizes, this will lead to increased human foot traffic, trampling the dunes which are essential to the beach mouse's survival.

Even assuming that Dr. Holler's assumption of increased utilization is correct, the effects of this use can easily be minimized by the State of Alabama, for increased use of the park is as much the state's problem for maintaining a public park on critical habitat as it is DeWeese's for attracting customers who might then use the park. Currently, there are two boardwalks across the dunes to prevent trampling. Signs directing park patrons to use those boardwalks could go a long way toward alleviating the problem, as could construction of more boardwalks. Moreover, if overuse becomes a problem, the park could simply be closed to the public.

In sum, the Court finds that the causal link between the DeWeese project and the factors which Dr. Holler theorizes will lead to the extinction of the beach mouse simply has not been proven. This conclusion is strengthened by the draft jeopardy opinion written by FWS. In that opinion, the FWS found that there were reasonable and prudent alternatives that would permit construction of the DeWeese project without threatening the existence of the beach mouse. Those alternatives were unacceptable to DeWeese because he would have been required to purchase 21.5 acres of land north of the highway and donate that land to the state so that no further development would occur north of the highway.

The significance of this draft opinion is that the FWS found, in essence, that DeWeese's project alone does not threaten the beach mouse. It was only after DeWeese declined to purchase the adjacent land that the FWS found that his project jeopardized the continued existence of the beach mouse. The contradiction in the FWS final biological opinion and the draft opinion is obvious: it is not that the development of DeWeese's project alone which threatens the beach mouse. Rather, it is the prospect of DeWeese's development coupled with possible future development of the other 21.5 acres that poses the threat. That possibility of future development cannot be used to stop DeWeese's project

which, by itself, does not pose a threat to the beach mouse.

It is the lack of a causal link between the DeWeese project and the potential harm projected by plaintiff's expert that distinguishes this case from those cases cited by plaintiff. Plaintiff relies heavily on *Palila v. Hawaii Dept. of Natural Resources*, 852 F.2d 1106 (9th Cir.1988), wherein the Ninth Circuit upheld the district court's finding that "habitat destruction which could drive [an endangered species] to extinction constitutes 'harm'." *Id.* at 1108. Relying on this language, plaintiff argues that the distinction between habitat destruction that *could* cause harm and habitat destruction that *would* cause harm lightens her burden. This distinction has no significance in this case, however, because plaintiff has failed to prove the crucial link between DeWeese's project and the predicted habitat destruction.

In *Palila* there was no question that the habitat of the Palila, an endangered species of bird, was being destroyed by the mouflon sheep which ate the mamane tree critical to the Palila's existence. Consequently, the court found that the continued existence of mouflon sheep in the same area as the Palila could threaten the continued existence of the Palila by eliminating their food source. Similarly, in *Sierra Club v. Lyng*, 694 F.Supp. 1260 (E.D.Tex.1988), *modified, Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir.1991), the district court found that the past timber practices of the Forest Service was largely responsible for the rapid decline in the red cockaded woodpecker populations and, therefore, that a "taking" had occurred because these habitat modifications actually killed or injured wildlife.

In this case, the Court is simply not persuaded that the DeWeese project would lead to the destruction of beach mouse habitat which in turn could threaten the existence of the beach mouse. It may well be true that a combination of house mice, cats and human foot traffic in the critical habitat could cause extinction of the beach mouse, but it would be speculative to say that DeWeese's project would cause the influx of either house mice, cats or humans.

Plaintiff's alternative theory to support her request for an injunction is that DeWeese's development may foreclose designation of his land as critical habitat. As part of her complaint, plaintiff seeks to affirmatively enjoin the Secretary of the Interior to take appropriate steps to prevent the extinction of the Perdido Key beach mouse. Plaintiff claims that one of the steps necessary in this regard is to designate all beach mouse habitat north of Highway 182 as "critical habitat". The Court finds that, as to this claim, plaintiff has also failed to prove a likelihood of success on the merits.

■ First, in order to succeed on this aspect of her claim against the Secretary, plaintiff must have standing. The ESA gives private citizens standing to enforce the provisions of the Act against the Secretary "where there is alleged a failure of the Secretary to perform any act or duty under section 1533 ... which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). Under the Act the Secretary has discretion as to whether to revise the designation of critical habitat. 16 U.S.C. § 1533(a)(3)(B). Thus plaintiff has no standing to affirmatively enjoin the Secretary to add property to the designated area of critical habitat.

Once again, the case at hand is easily distinguishable from the case cited by plaintiff in support of her argument. In *Northern Spotted Owl v. Lujan*, 758 F.Supp. 621 (W.D.Wash.1991), the Secretary failed to designate critical habitat at the time the species was listed as endangered. The court in that case found that the language of the Act mandated designation of the critical habitat concurrently with the listing of the species unless critical habitat was not determinable at the time of the listing. *Id.* at 626–27. In this case critical habitat was designated for the beach mouse at the time it was listed as endangered. Plaintiff seeks to revise the Secretary's designation of critical habitat to include the area north of the highway. Revisions of the Secretary's determination of critical habitat are, however, within the

Secretary's discretion. *See* 16 U.S.C. § 1533(a)(3)(B) ("The Secretary ... may, from time-to-time ... revise such designation.").

Plaintiff's attempt to circumvent this obstacle by artful pleading is not availing. Rather than directly seeking to affirmatively enjoin the Secretary to perform what is obviously a discretionary function, plaintiff seeks to affirmatively enjoin the Secretary to adopt and implement a recovery plan. Plaintiff contends that the recovery plan adopted by the Secretary should include the designation of the property north of the highway as critical habitat.

Assuming, *arguendo*, that the adoption of a recovery plan is mandatory, the contents of those plans are discretionary. With respect to the development and implementation of recovery plans, the ESA states:

(f) Recovery plans

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, **to the maximum extent practicable,**

\*    \*    \*    \*    \*    \*

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective and measurable criteria which, when met would result in determination, in accordance with the provisions of this section, that the species be removed from the list;  and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1) (emphasis added).

It is undisputed that the Secretary has already developed a recovery plan. Plaintiff's complaint is that the recovery plan is insufficient because it does not designate the area north of the highway as critical habitat. As noted above, the contents of the plan are discretionary, as evidenced by the language "to the maximum extent practicable".

Moreover, even if the language did mandate the contents of the plan, the evidence does not support plaintiff's claim that the goal of the plan, *i.e.*, the recovery of the beach mouse, can be achieved only through the designation of the area north of the road as critical habitat. Critical habitat is defined as the areas occupied by the species as the time it is listed as endangered or specific areas outside the area occupied by species at the time it is listed if the Secretary determines that such areas are "essential for the conservation of the species." 16 U.S.C. 1532(5).

Although Dr. Holler testified that the habitat north of the highway is critical to the viability of the beach mouse, his opinion must be tempered by the facts. First, the FWS did not consider the area critical in 1985 when it listed the Perdido Key Beach Mouse as endangered. Although the Secretary listed two other sites where no beach mouse existed as critical, he did not list the area north of Highway 182. At that time studies showed that the area was not suitable beach mouse habitat. It is still debatable whether the DeWeese property is suitable habitat.

CONCLUSION

The Perdido Key beach mouse has proven itself a survivor in the limited remaining habitat that is available to it on this earth. It has lived, expanded, been trapped and transported to other areas, subject to predation by foxes, cats and snakes, competition by house mice, tromping of beachgoers, and survived hurricanes for years without ever having set foot on DeWeese's property. It has survived all this, without ever having to move north. It should continue to survive in the future.

The plaintiff and Dr. Holler would like to preserve every square inch and grain of

**434**

sand of the potential beach mouse habitat, and stop any possibility of outside human or predator intrusion with the truly laudable goal of affording a tiny creature every conceivable possibility of survival. But to paraphrase Stuart Little, their wishes and the law are not the same, and the Perdido Key Beach mouse's travels to the north do not spell the end of its days.

For the reasons set forth above, it is ORDERED that plaintiff's motion for a preliminary injunction be and hereby is DENIED. Furthermore, the Court having previously granted the plaintiff's motion to consolidate the trial on the merits with the motion for preliminary injunction in the Plaintiff's case against DeWitt DeWeese, Jr. by separate order the Court will enter judgment in favor of defendant DeWitt DeWeese, Jr. pursuant to Fed.R.Civ.P. 54(b).