**THE HAWKSBILL SEA TURTLE,**
**(ERETMOCHELYS IMBRICATA), et al., Plaintiffs**
**v.**
**FEDERAL EMERGENCY MANAGEMENT AGENCY,**
**an agency of the United States of America, et al., Defendants**

Civil No. 96-114 & 97-187

District Court of the Virgin Islands

Division of St. Thomas and St. John

July 2, 1998, Decided

269

A. Jeffrey Weiss, Esquire, St. Thomas, U.S.V.I., *for plaintiffs*

James Bryan Dougherty, Esquire, Washington, D.C., *for plaintiffs*

Richard Austin, Esquire, St. Thomas, U.S.V.I., *for defendant*

Hon. Julio Brady, Esquire, Ernest Batenga, Esquire, Kingshill, St. Croix, U.S.V.I., *for defendant*

Mark A. Brown, Esquire, U.S. Department of Justice, Washington, D.C., *for defendants*

John M. Ebersole, Esquire, Kahlman Fallon, Esquire, Department of the Interior, Office of Regional Solicitors, Southeast Regions, Atlanta, GA., *for defendant*

Toni Florence, Esquire, Assistant U.S. Attorney, St. Thomas, U.S.V.I., *for defendant*

Jordan S. Fried, Esquire, David A. Trissell, Esquire, Office of General Counsel, Federal Emergency Management Agency, Washington, D.C., *for defendant*

MICHAEL MCLEMORE, ESQUIRE, Department of Commerce, NOAA, Office of General Counsel, Southeast Regional Office, St. Petersburg, FL., *for defendant*

LOIS PILGRIM, ESQUIRE, Virgin Islands Housing Authority, St. Thomas, U.S.V.I., *for defendant*

STANLEY S. BROTMAN, *United States District Judge*, Sitting by Designation.

Presently before this Court are Plaintiffs' claims under Sections Seven ("Section 7")[1] and Nine ("Section 9")[2] of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and their Applications for Permanent Injunctive Relief and Declaratory Relief.

## INTRODUCTION AND PROCEDURAL HISTORY

In January 1996, a group of persons who own real property and reside in the vicinity of Vessup Bay, St. Thomas and who use and enjoy the waters and shoreline of Vessup Bay, Muller Bay, Red Hook Bay, Pillsbury Sound, and adjacent waters filed suit in the District Court of the Virgin Islands to enjoin the construction of the temporary housing project on Tract No. 1, Red Hook Quarter, St. Thomas.[3] In that case, *Virgin Islands Tree Boa v. Witt*, 34 V.I. 199, 918 F. Supp. 879 (D.V.I. 1996), decided by Judge Raymond Finch, plaintiffs alleged that the temporary housing project would cause harm to the Virgin Islands Tree Boa and other endangered species.[4] In particular, they alleged that the Federal Emergency Management Agency ("FEMA") and the United States Fish and Wildlife Service ("FWS") had violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, by not protecting and

---

[1] 16 U.S.C. § 1536.

[2] 16 U.S.C. § 1538.

[3] Among the Plaintiffs were also a condominium association representing individual unit owners at the Eastwind Condominiums, as well as three endangered and protected species named as parties in their own right.

[4] In the first action, the Virgin Islands Tree Boa (Epicrates monensis granti) was a named plaintiff, together with 86 St. Thomas residents and property owners. *Tree Boa*, 918 F. Supp. at 885. The Hawksbill Turtle (Eretmochelys imbricata) and the Green Sea Turtle (Chelonia mydas) were not named parties in the first suit. *See id.* at 892.

conserving endangered species during the environmental consultation stage of the temporary housing project. The District Court, however, denied plaintiffs' request for preliminary injunctive relief. After hearing oral argument on March 4, 1996, the United States Court of Appeals for the Third Circuit affirmed the Court's opinion and order, denying relief without opinion. *Virgin Islands Tree Boa v. Witt*, 82 F.3d 408 (3d Cir. 1996).

Soon after the Third Circuit's decision, Plaintiffs filed a motion dismissing their original complaint, and then filed another Complaint ("Complaint" or "Complaint I") in the United States District Court for the District of Columbia again seeking to enjoin construction and occupation of the temporary housing project. On April 2, 1996, Plaintiffs moved for a temporary restraining order in that court, which was denied. On May 30, 1996, before hearing oral argument on Plaintiff's motion for a preliminary injunction, the court transferred the case to the District Court of the Virgin Islands. On June 6, 1996, Judge Finch recused himself from hearing the case, which was then assigned to United States District Judge Stanley S. Brotman, Senior Judge of the District of New Jersey, sitting by designation.

Plaintiffs alleged that, in planning for and providing the temporary emergency shelters, Defendants violated numerous provisions of the ESA and caused irreparable harm to several endangered and threatened species and their habitats in the area of and around Vessup Bay in St. Thomas. Specifically, Plaintiffs alleged harm to the Virgin Islands Tree Boa ("Tree Boa"), the Hawksbill Sea Turtle, the Green Sea Turtle, and other unnamed species, and sought preliminary injunctive relief.[5] The District Court, after a hearing, denied Plaintiffs' motion on collateral estoppel grounds. *Hawksbill Sea Turtle v. Federal Emergency Management Agency*, 35 V.I. 213, 939 F. Supp. 1195 (D.V.I. 1996).

On appeal, the Third Circuit found that this Court had improperly relied upon the factual findings of Judge Finch. Accordingly, it reversed the Court's opinion and order and remanded the case for reconsideration of Plaintiffs' motion for preliminary injunction.

---

[5] In the present action, the Hawksbill Sea Turtle, the Green Sea Turtle, and the Virgin Islands Tree Boa are all named plaintiffs.

*Hawksbill Sea Turtle v. Federal Emergency Management Agency*, 37 V.I. 526, 126 F.3d 461, 478 (3d Cir. 1997). It also directed the Court to dismiss Plaintiffs' claims with respect to the Hawksbill and Green Sea Turtles (collectively, "Sea Turtles" due to their failure to comply with the notice requirements of the ESA. *Id.*The Third Circuit noted, however, that, since filing the Complaint, Plaintiffs had provided the requisite notice and were now at liberty to refile their claims and request that the matter be consolidated with the Tree Boa proceedings presently before this Court. 126 F.3d at 473.

On remand, the claims with respect to the Sea Turtles were dismissed, and Plaintiffs then refiled those claims in a separate complaint ("Complaint II"). Pursuant to the suggestion by the Third Circuit and Fed. R. Civ. P. 42, the Court consolidated the claims into the present action, and also consolidated the preliminary injunction hearing and final hearing pursuant to Fed. R. Civ. P. 65.

On October 31, 1997, the Court held oral argument on Plaintiffs' and Defendants' Cross Motions for Summary Judgment. After argument, the parties made several unsuccessful attempts to resolve the matter. Thereafter, they requested that the Court make its final determination on the merits. The parties agreed that a trial was unnecessary as they had submitted all of the relevant evidence in support of their positions through motions, memorandums of law, supporting exhibits, and testimony presented during the August 7 and 8, 1996 hearings, and further testimony and argument would be cumulative. The Court concurred and ordered both sides to submit proposed findings of fact and conclusions of law by January 31, 1998. It now proceeds to decide all pending matters and issue a final determination on the merits.

## FINDINGS OF FACT

The basis of the Findings of Fact has been the oral testimony and exhibits, including the administrative record, presented during the August 7 and 8, 1996 preliminary injunction hearing. Pursuant to an agreement between the parties,[6] the Court has considered the

---

[6] Because Dr. Tolson was unable to testify at the hearing due to a prior commitment, the parties agreed that Plaintiffs submit an affidavit in lieu of his personal testimony, giving

Supplemental Affidavit of Peter J. Tolson, Ph.D. in Lieu of Personal Testimony, Plaintiff Exhibit P-1, weighing this "testimony" in light of the objections made in Federal Defendants' Objections Affidavits of Peter Tolson and Teresa Turner filed subsequent to the hearing ("Objections"). The Court has also considered the Affidavit of Teresa Turner, Ph.D., Plaintiff Exhibit P-2, under the same standards.[7]

## I. BACKGROUND

1. In September 1995, Hurricane Marilyn struck St. Thomas, displacing hundreds of people from their homes and causing substantial property damage. At the request of Governor Roy L. Schneider, and under Section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5170 (1988) ("Stafford Act"), President Clinton declared the Virgin Islands a disaster area. Administrative Record ("A.R.") 24 § 3.1.1.1.

2. Five months after the hurricane, many low-income Virgin Island residents were still living in emergency shelters. Some individuals were inhabiting condemned facilities, including major buildings of the Warren E. Brown public housing apartments and individual homes. A great need for emergency shelter existed. *Id.* § 1.0.

3. Pursuant to the Stafford Act, FEMA made funds available to the Virgin Island Housing Authority ("VIHA") for a temporary housing shelter project consisting of prefabricated structures. The

---

Defendants an opportunity to respond to the material in the affidavit at the hearing. For whatever reasons, Plaintiffs delayed in presenting the affidavit to Defendants until the evening before the hearing, thus providing Defendants inadequate time to prepare rebuttal testimony. Therefore, the Court permitted Defendants to file written objections to Dr. Tolson's affidavit after the hearing. Transcript of August 1986 Hearing, Vol. 1 at 6-9.

[7] At the hearing, Plaintiffs also attempted to submit the Affidavit of Dr Teresa Turner, Ph.D., Plaintiff Exhibit P-2, in lieu of her personal testimony. Once again, Plaintiffs delayed in presenting the affidavit to Defendants until the evening before the hearing. Furthermore, unlike the procedure they followed in submitting the Supplemental Affidavit of Peter J. Tolson, Ph.D. in Lieu of Personal Testimony, Plaintiffs did not seek the Defendants' consent prior to the hearing. This Court reserved on the question of the Affidavit's admissibility into evidence until it received Defendants' written objections. Transcript of August 1986 Hearing, Vol. 1 at 9-10. Having received Defendants' written objections, this Court will admit the Affidavit into evidence subject to Defendants' objections. The Court, however, will not consider the March 28, 1996 letter of Dr. Karen Eckert supplied by Defendants in rebutting this Affidavit.

VIHA reviewed several sites and ultimately selected 8.5 acres at Estate Nazareth adjacent to Vessup Bay. The project was entitled the Estate Nazareth Emergency Shelter project ("Project"), which planned to house a maximum 800 people, although the VIHA estimated that shelter for only 550 people was necessary. *Id.* § 2.3.

## II. GEOGRAPHY

4. The project site is directly adjacent to Highway 32 between the National Guard Armory and the Ivanna Eudora Kean High School. It is surrounded on three sides by other, pre-existing developments. Only the northern side of the site is undisturbed. *Id.* § 3.3.1.1; Transcript of August 1986 Hearing ("Tr. of Aug. 1986 Hearing"), Vol. 2 at 268.

5. The western side of the project site consists of cleared land for the St. Thomas Swimming Association Community Aquatic Center, which extends up to the National Guard Armory. A.R. 24 § 3.1.1.1.

6. The southern side of the project site is bordered by Highway 32 and existing residences on a hill slope. *Id.*

7. The eastern side of the project site consists of highly disturbed vegetation and cleared land belonging to the Vessup Bay Wastewater Treatment Plant. *Id.*

8. The northern side of the project site consists of thorn scrub and woodland on the undisturbed hill slopes to Benner Hill. *Id.*

9. The site is situated within a flood plain of an unnamed intermittent stream and gently sloping alluvial plain that drains toward Vessup Bay, which begins offsite at the southeast side of the road beyond the sewage treatment plant parcel. *Id.* The project site is several hundred yards from Vessup Bay. Tr. of Aug. 1986 Hearing, Vol. 1 at 48.

## III. THE PROJECT PLANS

10. As indicated in its final Environmental Assessment ("EA"),[8] dated November 16, 1995, the temporary Project consists of

---

[8] The EA memorializes FEMA's consideration of possible environmental effects, as well as conservation measures identified to mitigate those possible effects, associated with the construction and occupation of the Project. FEMA considered existing environmental documentation concerning the project site, including the 1989 EA compiled for construction of a community aquatic center at the adjacent St. Thomas Swimming

prefabricated buildings on concrete footings. A maximum of 56 buildings was to be built. A.R. 24 § 2.3.

11. The VIHA indicated that it would dismantle the prefabricated buildings as families moved out of the Project into permanent housing. *Id.*

12. The planned duration of the Project was "approximately 6 months, and . . . it would not be extended under any circumstances for a total duration exceeding 18 months." A.R. 24 § 2-3 to 2-4.

13. By "duration," FEMA meant "occupancy," Tr. of Aug. 1986 Hearing, Vol. 2 at 322, which was not to exceed eighteen months.

14. The final EA provides that at the conclusion of the Project, the site is to be "returned to a grade that generally conforms to original conditions upon dismantling and seeded with suitable native ground cover species to prevent erosion. The site shall be allowed to return to woodland and thorn scrub vegetation through natural recolonization." A.R. 24 § 3.1.1.3.

## IV. TREE BOA

15. The Tree Boa has a very limited geographic range and is found exclusively on the eastern portion of St. Thomas. There are presently 500 or fewer of the species in existence. Supp. Aff. of Dr. Peter Tolson ¶¶ 10, 12 (Aug 5, 1996).

16. The Tree Boa is a secretive, nocturnal animal that feeds on lizards within trees. A.R. 24 § 3.1.1.1. During the day it likely inhabits rock piles, old fence rows, and debris piles. *Id.* It may also hide in other areas, such as sub-surface crevices and solution holes. Supp. Aff. of Dr. Peter Tolson ¶ 15.

17. Tree Boas are less likely to occur in disturbed habitats, especially within cleared grassland areas. A.R. 24 § 3.1.1.1.

## V. SEA TURTLES

18. The Hawksbill and Green Sea Turtles are present in and

---

Association site and the EA compiled for the nearby Estate Nazareth Phase II "Abbey Hill at Nazareth" development. It also solicited input from local and federal environmental agencies including the Environmental Protection Agency, the FWS, as well as the Environmental Protection, Coastal Zone Management, and Fish and Wildlife Divisions of the Virgin Islands Department of Planning and Natural Resources. In addition, FEMA conducted site surveys on October 27 and 31, 1995. (A.R. 24 § 3.1).

around Vessup Bay and in the general vicinity of the Project's marine environment. Tr. of Aug. 1986 Hearing, Vol. 2 at 262.

19. The Hawksbill Sea Turtle is an endangered species. Its primary food source is sponges. Coral reefs provide them with their general habitat. *Id.* at 156-57.[9]

20. The Green Sea Turtle is a threatened species. Its primary food source is turtle grass. Aff. of Dr. Teresa Turner ¶ 4 (July 29, 1996).

## VI. TREE BOA CONSULTATION

21. FEMA's consultation with the FWS concerning the endangered Tree Boa occurred prior to the publishing of the final EA.

22. During the planning stage of the Project and the preparation of the EA, FEMA identified the Tree Boa as the only endangered or threatened species that might potentially occur on the project site. *Id.* § 3.1.1.1.

23. On November 3, 1995, Dr. William Magdych of FEMA faxed a letter to the Boqueron, Puerto Rico field office of the FWS requesting the completion of consultation under Section 7 of the ESA. A.R. 16. This letter was accompanied by information, including, a description of the project, excerpts from FEMA's draft EA, and a letter from Ralf Boulon of the Fish and Wildlife Divisions of the Virgin Islands Department of Planning and Natural Resources detailing a "Tree Boa Mitigation Plan" to protect against potential impact to the species. A.R. 15.

24. The excerpts from the draft EA stated:

> The proposed project will result in the loss of potential habitat for tree boa, and could result in harm to individual tree boa. Although the project area is within the known area of tree boa inhabitation on St. Thomas, the project site does not appear to provide optimal habitat for tree boa based on the disturbed nature of the site, apparent lack of daytime resting areas (i.e., rock piles), and lack of established woodland vegetation within the

---

[9] Even though they do not eat corals, Hawksbill Sea Turtles may be adversely affected by the demise of corals in the Vessup Bay because corals form the foundation of the coral reef ecosysytems in which the Turtle and sponges reside. Aff. of Dr. Joshua Sladek Nowlis ¶¶ 5, 15 (Mach 25, 1996).

project impact area. Therefore, the project area is considered to provide relatively low-quality habitat for tree boa in comparison to the higher quality habitat on Benner Hill. The [Department of Fish and Wildlife] has indicated that a taking of tree boa pursuant to the Endangered Species Act can be avoided by implementing a site clearing process prior to disturbance of the site by heavy machinery. A similar requirement was implemented for St. Thomas Swimming Association's Community Aquatic Center project, adjacent to the project site. . . . Therefore, the proposed project is not expected to result in significant impacts on tree boa if site disturbance is done following this process.

*Id.* (parenthetical omitted).

25. The excerpts also stated the Project's duration would be six months. *Id.* The final EA stated, however, that the Project would "be needed for approximately 6 months, and that it would not be extended under any circumstances for a total duration exceeding 18 months." A.R. 24 § 2-3 to 2-4.

26. The Tree Boa Mitigation Plan stated that the project site was "within the center of distribution for the [Tree Boas] as determined through sightings and surveys." Accordingly, the Plan established a list of protective procedures to mitigate against potential impacts on the species. These were to be implemented prior to the initiation of construction and included instruction of personnel as well as hand clearing before heavy machinery was permitted to be operated on the site. *Id.*

27. In addition, Dr. Magdych had between four and six telephone conversations with FWS officials, including three conversations specifically with James Oland, Field Supervisor of the FWS, concerning the Project's effects on the Tree Boa. Tr. of Aug. 1986 Hearing, Vol. 2 at 391-95.

28. On November 3, 1995, Oland wrote a letter to Dr. Magdych in which he concluded that the proposed project was "not likely to adversely affect" the Tree Boa and that "no further consultation is required." Among the factors he cited in support of his determination were the (1) description of the site as "highly disturbed/partially cleared scrub vegetation," (2) Tree Boa Mitigation Plan

278

which included "surveys, education of personnel, and clearing of vegetation by hand," and (3) promises that a "reforestation project, using native vegetation, [would] follow once the housing project is dismantled and removed." A.R. 17.

29. Oland also stated in the letter that "if modifications are made or if additional information becomes available concerning listed species, consultation should be reinitiated." *Id.*

30. In his June 20, 1996 Certification, Oland listed the materials upon which he relied in making his determination. They included all of the information submitted on November 3, 1995 by Dr. Magdych, and various texts and articles on the Tree Boa. Cert. of James P. Oland ¶ 4 (June 20, 1996).

31. Dr. David Nellis and Dr. Peter Tolson, authors of the Virgin Islands Tree Boa Recovery Plan, are generally recognized as the leading experts on the Tree Boa.

32. At no time during the consultation process were Dr. Nellis or Dr. Tolson personally contacted for their opinions on the Project. *See* Tr. of Aug. 1986 Hearing, Vol. 2 at 280; Supp. Aff. of Dr. Peter Tolson ¶ 4.

33. Dr. Magdych reviewed articles authored by Dr. Tolson in compiling the EA. A.R. 24 § 5.0; Tr. of Aug. 1986 Hearing, Vol. 2 at 280.

34. James Oland also reviewed articles authored by Dr. Nellis and Dr. Tolson in conducting consultation. Cert. of James P. Oland ¶ 4.

## VII. SEA TURTLES CONSULTATION

35. Originally, FEMA considered Vessup Bay to be a sensitive habitat. (A.R. 24 § 3.1.1.1).

36. In the final EA, FEMA, in discussing the impact of the proposed project on Vessup Bay, concluded that:

Water quality in Vessup Bay shall not be degraded by indirect effects of the project. The Vessup Bay sewage treatment facility has permitted capacity to handle the expected additional 43,250 gallons per day that would be generated by the project; therefore, no further mitigation regarding sewage capacity is recommended. Stormwater runoff and onsite damage controls shall be provided to avoid potential adverse impacts from runoff.

*Id.* § 3.1.1.3.

37. FEMA was aware that the Sea Turtles were present in Vessup Bay before it published its final EA and site clearing began. Dr. Magdych had observed them in the outer portions of the Bay. Tr. of Aug. 1986 Hearing, Vol. 2 at 262.

38. Dr. Magdych testified that he obtained published documentation and other material on the Sea Turtles from local agencies. He was not sure, however, that they were included in the bibliography for the final EA. *Id.* at 263.

39. Based on his review of the materials that he received, Dr. Magdych concluded that, although Sea Turtles were present in the Bay, since the Project would not affect the marine environment, it would not affect the Sea Turtles. *Id.* at 263-64.

40. On June 25, 1996, after construction on the project commenced, Dr. Magdych submitted a letter to the Southeast Regional Office of the National Marine Fisheries Service ("NMFS") in St. Petersburg, Florida regarding possible project effects on the Hawksbill and Green Sea Turtles ("Sea Turtles"). A.R. 71.

41. The letter stated that FEMA was aware that the Sea Turtles may be present in Vessup Bay and requested confirmation that the Project was not expected to adversely affect the two species. *Id.* The letter also made reference to the Projects final EA, which had been transmitted to the NMFS's regional office. *Id.*

42. On June 26, 1996, NMFS Regional Director Andrew J. Kemmerer issued a written determination that "the proposed activities are unlikely to adversely affect endangered or threatened species under the purview of the NMFS or their critical habitat" and concluded consultation. He based his determination on three reasons: (1) the increase in volume of sewage to be treated by the facility is not projected to exceed levels for which the facility has previously been permitted; (2) sea turtles rarely, if ever, occur in the inner bay area; and (3) the proposed project is a temporary measure. A.R. 72.

43. Kemmerer also stated in the letter that "consultation should be reinitiated . . '. if new information reveals impacts of the identified activity that may affect listed species, a new species is listed, new critical habitat is designated, or the activity is subsequently modified." *Id.*

44. The entire consultation regarding the Sea Turtles occurred after construction on the Project had begun.

## VIII. TREE BOA "TAKINGS"

45. On December 4, 1995, construction of the Project began.

46. Dr. Tolson concluded that Tree Boas were killed because they were present on the project site during construction. He based this determination on his personal experience and observations of the site prior to clearing and his belief that it provided "high quality habitat" for the Tree Boa. Supp. Aff. of Dr. Peter Tolson ¶¶ 13, 14.

47. Several sightings of Tree Boas had occurred near the project site prior to its clearance. A.R. 24 § 3.1.1.1.

48. Plaintiffs failed to produce a witness that has observed firsthand any Tree Boas on the project site prior to construction, or any other credible evidence that Tree Boas existed on the project site prior to construction.

49. The project site was cleared in the manner designated by the Tree Boa Mitigation Plan detailed in the EA. *See* A.R. 32, 35.

50. No Tree Boas were found or killed on the site during this process. Tr. of Aug. 1986 Hearing, Vol. 2 at 396-97.

51. No Tree Boas were found or killed on the site after construction commenced. *Id.*

52. Dr. Tolson also concluded that "the site clearing and continued development of [the Project] has demonstratively adversely affected feeding and sheltering patterns of the [Tree Boa] as a result of the modification and degradation of its habitat." Supp. Aff. of Dr. Peter Tolson ¶ 24.

53. In support of his conclusion that the Project has adversely affected feeding patterns of the Tree Boa, Dr. Tolson stated that:

> when individual boas are forced to move to other areas of an already diminished habitat, the recently colonized habitat cannot shelter and support the higher concentration of the boas due to limited carrying capacity. The result will be food shortages and increased competition among the remaining animals. This increased competition would invariably lead to the death or injury of individuals that, due to age, infirmity, or inferior physical attributes, are simply unable to compete with more rigor-

281

ous members of the population for available food resources. Thus, as a result of the Estate Nazareth project, the available uncleared and undeveloped boa habitat may become overpopulated, leading to boa deaths due to starvation.

*Id.* ¶ 39.[10]

54. Dr. Tolson did not cite any studies or other evidence to support his conclusion.

55. More importantly, Plaintiffs have provided no direct evidence of Tree Boas that have died or been injured as a result of starvation. Furthermore, they provided no evidence of any general decline in the population of the Tree Boa due to starvation.

56. In further support of his conclusion that the Project has adversely affected sheltering patterns of the Tree Boa, Dr. Tolson stated that there has been a marked increase in Tree Boa sightings and injuries in the area surrounding the Project. In particular, he noted that in the past seven months there have been six documented sightings of tree boas within one quarter to one half mile of the project site. This translates to .85 boa sightings per month since defendants have begun actual work on the project. By contrast, as of 1985, there were only thirteen reported sightings, with thirty-eight documented total sightings since record keeping began in the early 1970's; an approximate average of .13 sightings per month. *Id.* ¶¶ 24, 25.

57. He also noted that two of the six sightings were of injured or dead Tree Boas. *Id.* ¶ 26; Aff. of Kevin Philip Qualls (June 26, 1996) (observing a live Tree Boa within one half mile of the Project on two occasions in late spring 1996, and a dead Tree Boa in June 1996).[11]

58. Dr. Tolson attributed the increased sightings of Tree Boas and the increased reports of injured and dead Tree Boas to the Defendants destruction of Tree Boa habitat in constructing the

---

[10] He further stated that "as increased mortality of individual tree boas occurs from all of these sources, there will also be a reduction in genetic variability of the boa population on St. Thomas, leading to a higher degree of inbreeding which will result in inbreeding depression, and decreased viability and reproductive competency." *Id.* ¶ 40.

[11] A veterinarian stated that he had treated an injured Tree Boa found less than a quarter mile from the Project. Aff. of Andrew J. Williamson (March 7, 1996).

Project. Supp. Aff. of Dr. Peter Tolson ¶¶ 26, 27.

59. Specifically, he stated that it is *"very likely"* that the injuries and death of the two Tree Boas were the indirect results of the Defendants' actions concerning the Project since the destruction of Tree Boa habitat has forced Tree Boas into lower quality habitat which is in a closer vicinity to human habitation. *Id.* ¶ 27.

60. Dr. Tolson further opined that continued construction, development, and occupancy of the Project will lead to increased Tree Boa injuries and deaths, in addition to further disruption of their behavioral patterns. *Id.* ¶ 28.

61. Plaintiffs, however, provided no evidence of a causal relationship between the habitat modification caused by the Project and the actual harm to the two Tree Boas. Furthermore, they provided no evidence of any general decline in the population due to adverse effects on Tree Boa sheltering patterns.

62. Dr. Tolson concluded that the occupation of the Project by hundreds of people will harm Tree Boas within or adjacent to the project site. *Id.* ¶ 32.

63. In support of his conclusion, Dr. Tolson stated that "inevitably" Tree Boas will migrate onto the project site seeking shelter. They will then become more visible to the human occupants whose "inevitable" reaction upon seeing the animals will be to attempt to injure or kill them. *Id.* ¶¶ 32-34.

64. In support of his conclusion, Dr. Tolson also stated that feral predators, such as cats, dogs, mongoose, and rats, will be attracted to the project site by the presence and smell of food. These predators will then venture into the remaining habitat that surrounds the Project and injure or kill Tree Boas. *Id.* ¶¶ 36-38.

65. Dr. Tolson, however, did not cite any studies or other evidence to support his assumptions that (1) Tree Boas will migrate onto the project site to seek shelter, and (2) humans will react to the sight of the animals by attempting to injure or kill them.

66. Dr. Tolson also did not cite any studies or other evidence to support his assumptions that (1) the Project will attract feral predators, and (2) that the introduction of these feral predators into the Project will lead to Tree Boa deaths and injuries.

## VIII. SEA TURTLES "TAKINGS"

67. In accordance with the EA, during construction FEMA also

implemented mitigation measures intended to control stormwater runoff and to retard soil erosion to mitigate against the potential adverse effects of erosion and sedimentation on the marine environment in the Vessup Bay. These measures included: preserving the vegetated swale at the front of the project site, constructing drainage ditches around the site, lining the drainage ditches with rocks, lining the project site with gravel, and using silt fences during construction of the Project. Tr. of Aug. 1986 Hearing, Vol. 2 at 245-46.

68. In addition, the project site possessed natural features that protected against runoff, such as permeable soils and existing land forms that divert water from the surrounding area away from the project site. *Id.* at 243-44.

69. Since site clearing commenced, witnesses have observed large quantities of sediment laden runoff flowing from the site into Vessup Bay after rainstorms. *Id.* at 49, 106, 139.

70. They have also testified that such runoff was not a normal occurrence before site clearing and construction on the Project began. *See, e.g., id.* at 49-50.

71. Although Defendants have attempted to show that the runoff was the result of other construction projects in the area, they have failed to produce evidence that other significant construction projects existed that could have caused the runoff.

72. Given Plaintiffs' evidence and Defendants' failure to establish legitimate alternative causes of the runoff through either circumstantial evidence or eyewitness testimony, this Court finds that the observed sediment laden runoff is a direct result of the construction on the project site.

73. Plaintiffs' argument with respect to the Sea Turtles is that the Project has or will modify and degrade the Sea Turtles' habitat in a way that adversely affects its feeding and sheltering patterns by causing increased sediment runoff and discharge of partially treated sewage effluent into Vessup Bay.

74. Drawing inferences from a study that he did of a similar bay in St. Lucia, Dr. Joshua Sladek Nowlis testified that sediment laden runoff from the Project is likely to have damaging effects on the marine environment in Vessup Bay. *Id.* at 150-51; *see also* Aff. of Dr.

284

Teresa Turner ¶ 4. The runoff is likely to have its largest effects on the middle of the Vessup Bay, which is where sea grasses grow. *Id.* at 150-51. It will also jeopardize the coral reefs that are in the outer bay. *Id.* at 151.

75. Dr. Nowlis testified that the sea grasses "are going to die" because the nutrient content of Vessup Bay will be too high, *Id.* at 154, and the sediment pollution will "kill" the coral reefs and the sponges that live on them by "smothering" them. *Id.* at 156.[12]

76. He testified, however, that he had never directly observed any specific effects in the Vessup Bay from the Project on sea grasses, corals, or sponges because he had not performed any investigations on the Bay. *Id.* at 168-69.

77. Without such observations, it is difficult to measure the extent of the damage, if any, that will be done to the marine environment in Vessup Bay.

78. In addition to the sedimentation, Dr. James P. Beets testified that the increase in sewage effluent discharged into Vessup Bay may also have harmful effects on the marine environment.

---

[12] In an affidavit, Dr. Nowlis gives a more detailed description of the effects of sedimentation on sea grasses, corals, and sponges:

Sediments present physical problems for turtle grass, corals, and sponges, none of which can move away from settling particles. Turtle grass, if covered more quickly than it can grow, gets buried. Corals can actually slough off moderate amounts of sediment, but the amount of sediment that will result from a major project built in a flood plain so close to a sensitive bay will far exceed what corals can handle. These corals will also be buried, especially when storm runoff carries large quantities of sediments into the bay. . . . Sponges are the most sensitive of all to soil particles because they inadvertently attract it. Sponges feed on whatever food items they can filter out of the water. . . . When the water is laden with sediment, sponges become clogged in their incurrent siphons, where they take in unfiltered water, and in their excurrent siphons, where filtered water is released. . . . Sediments also cause chemical problems. Land based soils have high nutrient levels relative to what typically occurs in healthy tropical marine communities. These nutrients do further damage to turtle grasses, corals, and sponges by favoring competitors. Increased nutrients promote the growth of microalgae in the water column. These algae cloud the water and reduce the amount of light that reaches the turtle grasses, corals, and sponges. Turtle grass, being a plant, relies on sunlight as its sole energy source. Though they are technically animals, corals and sponges both get substantial energy from symbiotic zooxanthellae, algae cells that live in the animal colony and produce energy for the animal from sunlight. By blocking sunlight, these microalgae will decrease the productivity of turtle grasses, corals, and sponges."

Aff. of Dr. Joshua Sladek Nowlis ¶¶ 11, 12.

79. The Vessup Bay Wastewater Treatment Plant ("VBWTP" or "Plant") processes the sewage generated by the Project. A.R. 24 § 3.1.1.3; Tr. of Aug. 1986 Hearing, Vol. 1 at 86.

80. It is a secondary sewage treatment facility, meaning that it kills pathogenic bacteria, but does not remove nutrients from the sewage. Tr. of Aug. 1986 Hearing, Vol. 1 at 81-82.

81. The VBWTP has the capacity to handle the additional sewage that would be generated by the Project. A.R. 24 § 3.1.1.3.

82. Dr. Beets testified that, where in most states the processed sewage or "sludge" is taken to a landfill, sludge from the VBWTP was not removed from the site, and it was possible that all of the nutrients from the sludge could make it into Vessup Bay. *Id.* at 81-82.

83. He also testified that the Project was going to more than double the amount of sewage processed by the VBWTP. Tr. of Aug. 1986 Hearing, Vol. 1 at 49.

84. He concluded that this increase in sewage would "certainly increase the degradation in [Vessup Bay]." *Id.* at 90.

85. Dr. Beets did not testify as to the extent of the damage that would be done to the marine environment in Vessup Bay.

86. Plaintiffs provided no credible evidence that Sea Turtles have been injured or died as a result of starvation or adverse effects on sheltering patterns. They provide no evidence of any general decline in the population of the Sea Turtles due to starvation. They also provide no evidence of any general decline in the population due to adverse effects on sheltering patterns.

87. Plaintiffs provided no credible evidence that Sea Turtles will be killed or injured since they have failed to show that the sponges and sea grasses located in the Vessup Bay are the only or primary food source for the Sea Turtles or that the Sea Turtles are food limited. *Id.* at 90, 192-93. Without this pivotal evidence, it is impossible for this Court to find that any damage to the marine environment in Vessup Bay, if indeed there is any, would jeopardize the existence of the Sea Turtles.

88. In fact, none of Plaintiffs' experts testified that the degrada-

tion of Vessup Bay would have any injurious effects on the Sea Turtles.[13]

Recognizing that the eighteen month occupancy period of the Project had expired and individuals continued to reside there, FEMA recently voluntarily reinitiated informal consultation with the FWS and NMFS. *See* Letter from Kathryn G. Rise Humphrey, FEMA, to James P. Oland, FWS (April 8, 1998); Letter from Kathryn G. Rise Humphrey, FEMA, to Colleen Coogan, NMFS (April 8, 1998). The FWS concluded that "Section 7 consultation for the [Tree Boa] still applies since no additional construction at the site has been proposed." Letter from James P. Oland, FWS, to Kathryn G. Rise Humphrey, FEMA (April 16, 1998). The NMFS concluded that the "increased period of use of the emergency housing project, and the subsequent delay in restoration of the project site does not represent new information that changes the basis for our previous determination. This project is not likely to adversely affect listed sea turtles in the marine environment." Letter from Andrew J. Kemmerer, NMFS, to Kathryn G. Rise Humphrey, FEMA (May 1, 1998).

On June 12, 1998, the Court conducted a contempt hearing in this case. At the hearing, the Virgin Islands Housing Authority represented to the Court that thirty-two families were currently residing at the Project. It further represented that plans were being made to evict and relocate these families as soon as possible, but that a housing shortage existed on St. Thomas. Also at the hearing, FEMA stated that it would be in charge of dismantling the Project and restoring the site after the Project had been completely evacuated. As requested by the Court, it

---

[13] The Court notes the following recent developments that are not included in our Factual Findings. First, despite statements in the EA that the Project was "temporary" and would last no longer than 18 months, it is now approximately 30 months old. It has been occupied for approximately 21 of those months. Defendants began vacating the Project early this year. On April 18, 1998 Roy L. Schneider, Governor of the Virgin Islands, ordered a stay of eviction until alternative housing can be found for the remaining residents. Sekai K. Mutunhu, *Task Force Meeting to Aid Nazareth Tenants*, The Virgin Daily News, April 22, 1998, at 3. Although plans are being made to move the residents out of the Project, to date, it has been reported that fifty-two families still currently reside there. Sekai K. Mutunhu, *Nazareth Families Moving to Ross*, The Virgin Daily News, May 22, 1998, at 4.

submitted its Preliminary Revegetation Plan for the Estate Nazareth Temporary Shelter Site.

## CONCLUSIONS OF LAW

### I. OUTSTANDING MOTIONS

#### A. CROSS MOTIONS FOR SUMMARY JUDGMENT

After oral argument was conducted on the Cross Motions for Summary Judgement, the parties stated for the record that this case was ripe for a final disposition, and that presentation of further testimony or argument at a trial would not be necessary. The Court, therefore, will deny the parties' Cross Motions for Summary Judgment as moot,[14] and proceed to issue its final determination on the merits.[15]

#### B. MOTION FOR LEAVE TO SUBMIT BRIEF AMICUS CURIAE

■ On January 5, 1998, the National Wildlife Federation ("NWF") moved to file an *amicus curiae* brief in support of Plaintiffs. "A court may grant leave to appear *amicus curiae* if it deems the proffered information timely and useful." *Liberty Lincoln Mercury v. Ford Mktg.*, 149 F.R.D. 65, 82 (D.N.J. 1993) (quoting *Yip v. Pagano*, 606 F. Supp. 1566, 1568 (D.N.J.), *aff'd*, 782 F.2d 1033 (3d Cir. 1985). The information provided in the brief is untimely since it comes almost two years after this action was commenced and several months after the parties completed briefing their Cross Motions for Summary Judgment. Although insightful, it also lacks utility since it does not directly address the facts or law at issue in this case. The motion is denied.

#### C. OBJECTIONS TO MAGISTRATE ORDER PRECLUDING DISCOVERY

Plaintiffs' have objected to the magistrate judge's July 29, 1996

---

[14] As naturally follows, all attending motions, including Plaintiffs' two most recent Motions to Strike exhibits 22 and 23 are also denied as moot. These Motions seek to strike evidence filed in support of Defendants' Motion for Summary Judgment. The Court has not considered the two exhibits in making its final determination on the merits.

[15] The Court, however, may at times refer to the briefs presented in support of the Cross Motions for Summary Judgment in order to frame cogently the issues and arguments presented in this case.

Order precluding discovery. For the reasons therein, the Court affirms this Order.

## D. RENEWED MOTIONS FOR SUMMARY JUDGMENT, PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs have recently submitted Renewed Motions for Summary Judgment, Preliminary, and Permanent Injunctive Relief. Without questioning the propriety of these new Motions, the Court will also deny them as moot except as to the issues of permanent injunctive and declaratory relief on which it is prepared to issue a final determination on the merits.

## II. ESA CLAIMS

The ESA represents a far-reaching commitment by the United States to prevent the loss of endangered species and restore the vitality of diminished populations. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, 57 L. Ed. 2d 117, 98 S. Ct. 2279 (1978). In this action, Plaintiffs seek relief for alleged violations of Sections 7 and 9 of the ESA.

### A. SECTION 7 CLAIMS
Section 7 contains the procedural safeguards of the ESA. Through these safeguards, the ESA seeks to insure against "takings" of endangered species.

#### 1. Standard and Scope of Review

■ The ESA does not contain internal standards for judicial review. As with many other environmental statutes, claims brought under the ESA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. *See H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459-60 (9th Cir. 1984). Specifically, judicial review of administrative decisions involving the ESA is governed by Section 706 of the APA. *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy* , 898 F.2d 1410, 1414 (9th Cir. 1990). "Under section 706, the reviewing court must satisfy itself that agency decisions are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law. The relevant inquiry is whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted) (citations omitted). "In reviewing the actions of a federal agency it is not the court's role to substitute its judgment for the agency's, particularly in areas which require application of agency expertise." *Defenders of Wildlife v. Administrator, Envtl. Protection Agency,* 688 F. Supp. 1334, 1352 (D. Minn. 1988), *aff' in part and rev'd in part on other grounds,* 882 F.2d 1294 (8th Cir. 1989). "Reasonable people could disagree as to the proper level of activism required by an agency under the ESA. The court will not substitute its judgment for the agency's in deciding as a general matter that the totality of defendant's actions taken to protect threatened and endangered species were insufficient." *Id.*

The APA also determines this Court's scope of review. "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 84 L. Ed. 2d 643, 105 S. Ct. 1598 (1985) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 36 L. Ed. 2d 106, 93 S. Ct. 1241 (1973)). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." 470 U.S. at 743-44 (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971). The focal point for this Court's review has been the administrative record pertaining to the challenged federal action. However, as the Plaintiffs' claims in this action include requests for permanent injunctive relief in connection with alleged violations of the ESA by Defendants, the Court has also considered oral testimony presented during a two day evidentiary hearing and other supplementary evidence filed by the parties.

## 2. Section 7(a)(1) Claims

Plaintiffs allege that Defendants violated their Section 7(a)(1) duties to conserve the Tree Boa and the Sea Turtles. Section 7(a)(1) provides in pertinent part that:

The Secretary shall review other programs administered by him and utilize such programs in furtherance of the

purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation[16] of endangered species and threatened species listed pursuant to section 1533 of this title.

16 U.S.C. § 1536(a)(1) (footnote added). Plaintiffs claim that Defendants' violated their Section 7(a)(1) conservation duties by constructing a housing project that would have a harmful effect on the Tree Boa and the Sea Turtles. They also aver that Defendants failed "to take the affirmative steps required by the ESA to conserve" the species. Complaint I ¶ 43; Complaint II ¶ 37.

■ This Court finds Plaintiffs' Section 7(a)(1) claims without merit. "Conservation plans under [Section] 7(a)(1) are 'voluntary measures that the federal agency has the discretion to undertake' and 'the [ESA] does not mandate particular actions be taken by Federal Agencies to implement [Section] 7(a)(1).'" *Strahan v. Linnon,* 967 F. Supp. 581, 596 (D. Mass. 1997) (quoting 51 Fed. Reg. 19926, 19931, 19934). "[A]gencies have 'some discretion in ascertaining how best to fulfill the mandate to conserve under section 7(a)(1).'" J. B. Ruhl, *Section 7(a)(1) of the 'New' Endangered Species Act: Rediscovering and Redefining the Untapped Power of Federal Agencies' Duty to Conserve Species,* 25 Envtl. L. 1107, 1132 (1995) (quoting *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy,* 898 F.2d 1410 (9th Cir. 1990)). "Reasonable people could disagree as to the proper level of activism required by an agency under the ESA. The court will not substitute its judgment for the agency's in deciding as a general matter that the totality of defendant's actions taken to protect threatened and endangered species were insufficient." *Defenders of Wildlife v. Administrator,*

---

[16] The term "conservation" means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." 16 U.S.C. § 1532(3).

*Environmental Protection Agency*, 688 F. Supp. 1334, 1352 (D. Minn. 1988), *aff'd in part and rev'd in part on other grounds* , 882 F.2d 1294 (8th Cir. 1989). Defendants have provided evidence that they have adopted various, specifically targeted mitigation measures in an attempt to conserve the Tree Boa and the marine environment in Vessup Bay. *See* A.R. 32, 35. On the other hand, Plaintiffs have not specified any conservation measures that Defendants have failed to take. Given Plaintiffs failure to specify alternative conservation measures, this Court must conclude that the Defendants' actions as a whole did not constitute an arbitrary and capricious failure to conserve threatened and endangered species. *See Strahan*, 967 F. Supp. at 595-96 (finding Section 7(a)(1) argument unpersuasive because plaintiff "has not demonstrated . . . specific measures that are necessary to prevent the loss of any endangered species" in addition to those adopted by the agency).

### 3. Consultation: A Three-Step Process

"The ESA prescribes a three-step process to ensure compliance with its substantive provisions by federal agencies. Each of the first two steps serves a screening function to determine if the successive steps are required." *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985). The first step requires '[t]he Federal Agency . . . [to] convey to the Director[17] . . . a written request for a list of any listed or proposed species . . . that may be present" in the area of the proposed action. 50 C.F.R. § 402.12(c); *see also* 16 U.S.C. § 1536(c)(1). If the answer is affirmative, the second step requires the agency to prepare a "biological assessment" ("BA").[18] 16 U.S.C. 1536(c)(1). The purpose of a BA is to "evaluate the potential effects of the action on listed and proposed species . . . [to] determine whether any such species . . . are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). It is used to determine "whether formal consultation . . . is necessary." *Id*. If the BA determines that a threatened or endangered species is likely to be adversely

---

[17] *"Director* refers to the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration, or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out. 50 C.F.R. § 402.02.

[18] Exceptions to the preparation of a BA still exist. *See infra* section 4 (discussing "informal consultation").

affected, the third step requires the agency to formally consult with the Service.[19] *Id.* § 402.14(b); *see also* 16 U.S.C. § 1536(a)(2). The formal consultation results in the Service issuing a "biological opinion." 50 C.F.R. § 402.12(g)(4); *see also* 16 U.S.C. § 1536(b). If the opinion concludes that the proposed action would jeopardize the species, then the action may not go forward unless the Service can suggest an alternative that avoids such jeopardy. 16 U.S.C. § 1536(b)(3)(A). If the opinion concludes that the action will not violate the ESA, the Service may still require measures to minimize the impact of the action. *Id.* § 1536(b)(4)(ii)-(iii).

### 4. Section 7(c)(1) Claims

Plaintiffs allege that Defendant FEMA violated Section 7(c)(1) by failing to prepare a BA addressing the possible impacts of the temporary housing project on the Tree Boa and the Sea Turtles. Complaint I ¶ 57; Complaint II ¶ 37. Section 7(c)(1) of the ESA provides in pertinent part that:

> To facilitate compliance with the requirements of [Section 7(a)(2)], each Federal agency shall, with respect to any agency action of such agency . . . request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536(c)(1). "A biological assessment shall evaluate the potential effect of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation . . . is necessary." 50 C.F.R. § 402.12.

---

[19] "*Service* means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate." 50 C.F.R. § 402.02.

Contrary to Plaintiffs' allegations,[20] FEMA was not required to prepare a BA in connection with the proposed housing project. The Federal Regulations state that a BA is required only for "Federal actions that are 'major construction activities.'" *Id.* § 402.12(b), *see also* 51 Fed. Reg. 19946, 19948 (1986). The Regulations define "major construction activity" as a "construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)]." *Id.* § 402.02 (emphasis omitted). NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") in connection with "legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Therefore, whether FEMA was required to prepare a BA depended, in turn, upon whether it was required to prepare an EIS under NEPA.

The Council on Environmental Quality has promulgated regulations containing detailed procedural requirements governing the threshold determination of whether an agency must prepare an EIS to comply with NEPA. *See* 40 C.F.R. § 1500.3. This determination begins with the agency's preparation of an environmental assessment ("EA"). *Id.* § 1508.9. An EA is a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged [EIS] . . . is necessary." *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 443 (7th Cir. 1990). Based on the EA, the agency can determine whether to prepare an EIS. 40 C.F.R. § 1501.4(c). If the agency determines that it will not prepare an EIS, it must prepare a "finding of no significant impact" ("FONSI") 40 C.F.R. § 1501.4(e). The challenged agency action in the instant case culminated in the preparation of an EA and a FONSI, rather than

---

[20] In support of their claim that Defendants violated Section 7(c)(1) by failing to prepare a BA, Plaintiffs primarily cite two cases, *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) and *Florida Key Deer v. Stickney*, 864 F. Supp. 1222 (S.D. Fla. 1994). These cases are clearly distinguishable. In both cases, the agency not only failed to prepare a BA, but generally failed to consult with the Service in any fashion. *See Thomas*, 753 F.2d at 763-64; *Florida Key Deer*, 864 F. Supp. at 1238. Here, FEMA did engage in consultation with the FWS and the NMFS, albeit informal consultation.

an EIS.[21] Since all "major Federal actions significantly affecting the quality of the human environment" require the preparation of an EIS, the challenged agency action could not be such an action. Therefore, by definition, the same action could not constitute a "major construction activity" under the ESA, and FEMA was not required to prepare a BA. *See Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, No. 97-1852, 1998 WL 145612, at *5, *6 (8th Cir. April 1, 1998).

In addition, the Federal Regulations provide a clear exception to an agency's duty to perform a BA when an endangered or threatened species is present in the area of the proposed agency action: Informal Consultation.

> Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary. . . . During informal consultation, the Service may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat.

50 C.F.R. § 402.13. A BA and informal consultation serve the same purpose: to assist the action agency in determining whether formal consultation is required. "As an alternative to a biological assessment, regulation 402.13 would imply that the action agency may undergo informal consultation to determine if the action is likely to adversely affect a listed species." *Pacific Rivers Council v. Robertson*, 854 F. Supp. 713, 720 (D. Or. 1993), *aff'd in part and rev'd in part on*

---

[21] Judge Finch found that FEMA met its requirements under NEPA in connection with the Estate Nazareth housing project by preparing an adequate EA and FONSI. *Tree Boa*, 918 F. Supp. at 897-900.

*other grounds sub nom., Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994); *see also Fund for Animals, Inc. v. Thomas*, 326 U.S. App. D.C. 412, 127 F.3d 80, 84 (D.C. Cir. 1997); *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 728 (10th Cir. 1997); *Florida Key Deer v. Stickney*, 864 F. Supp. 1222, 1228 (S.D. Fl. 1994) (stating that the "only exception to [t]he stringent [formal consultation] requirement comes when the action agency and the FWS, either after the agency prepares a biological assessment *or as a result of informal consultation*, agree that the agency action is not likely to affect any listed species or critical habitat" (emphasis added)).

Before beginning construction on the temporary housing project, FEMA conducted informal consultation as to the Tree Boa. *See* A.R. 15 (letter from Dr. Magdych attaching fourteen pages of information about proposed environmental effects of temporary housing project, including information on the Tree Boa, and requesting consultation); A.R. 17 (letter from James P. Oland, FWS, recommending implementation of mitigation plan and stating that "no further consultation is required"). On June 24, 1996, several months after beginning construction on the temporary housing project, FEMA conducted informal consultation as to the Sea Turtles.[22] *See* A.R. 71 (letter from Dr. Magdych attaching final EA and requesting confirmation of conclusion that Sea Turtles would not be adversely affected); A.R. 72 (letter from Andrew J. Kemmerer, NMFS, concurring with FEMA's determination that "the proposed activities are unlikely to adversely affect endangered or threatened species under the purview of the [NMFS] or their critical habitat" and terminating "consultation responsibilities"). Because FEMA conducted informal consultation as to all three species, it did not have to prepare any BA's.[23]

---

[22] Plaintiffs contest the "timeliness" of the informal consultation as to the Sea Turtles in their section 7(a)(2) claims. In their Section 7(c)(1) claim, however, they contest only the narrow issue of FEMA's failure to prepare a BA.

[23] Defendants also offer the argument that FEMA did not violate its Section 7(c)(1) duties because the information contained in its EA satisfied its requirement to produce a BA. The Federal Regulations permit an action agency to consolidate the production of a BA with other environmental reviews. *See* 16 U.S.C § 1536(c)(1); 50 C.F.R. § 402.06. Still, arguments similar to that made by Defendants have been rejected by other courts. *See, e.g., Ramsey v. Kantor*, 96 F.3d 434, 443 (9th Cir. 1996); *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). This Court need not engage in any further analysis of this issue,

Despite the fact that the Federal Regulations excused FEMA from preparing a BA, Plaintiffs still offer the argument that Defendants' reliance on the Federal Regulations in not preparing a BA was improper given the plain language of the statute. Plaintiffs, therefore, raise an issue of statutory construction.[24]

In *Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984), the United States Supreme Court established guidelines for courts to follow when reviewing an agency's construction of a statute.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative

---

however, since the "informal consultation" and "major construction activity" exceptions have excused FEMA from preparing a BA in this case.

[24] Plaintiffs first raised this statutory construction argument in their Reply Memorandum in Support of Cross-Motion for Summary Judgment. Defendants addressed the argument for the first time at oral argument on the Cross-Motions for Summary Judgment. They argued that Plaintiffs' challenge to the validity of 50 C.F.R. §§ 402.12 and 402.13 is barred by the statute of limitations. The statute of limitations governing actions against the United States requires that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). If a person challenges a procedural violation in the adoption of a regulation or brings a policy-based facial challenge to a government decision, he must do so within six years of the decision. *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991). If, however, a person challenges the substance of an agency decision as exceeding constitutional or statutory authority, he may do so later than six years following the decision. *Id.*

Defendants cite *Strahan v. Linnon*, 967 F. Supp. 581, 607 (D. Mass. 1997) to support their argument that Plaintiffs' challenge is time barred. In *Strahan*, the court found that Plaintiff's challenge to 50 C.F.R. §§ 402.03 was time barred because he brought a policy-based facial challenge to the regulation over six years after it had been promulgated. In this case, however, Plaintiffs challenge regulations as exceeding statutory authority. Accordingly, under *Wind River Mining Corp.*, the six year statute of limitations period does not apply, and the fact that the regulations were duly promulgated after notice of comment is immaterial.

interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agent to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

467 U.S. at 842-44 (footnotes omitted).

In response to the first question posed by the *Chevron* Court, this Court concludes that Congress has not directly spoken to the precise question at issue. That question is whether a BA is the sole means for identifying whether an endangered or threatened species is likely to be adversely affected by an agency's action. Plaintiffs point to the use of the compulsory "shall" language in Section 7(c)(1) to support their argument that Defendants had to conduct a BA when they learned that endangered or threatened species might be present at the site of the project. Still, this language does not show that Congress has directly spoken to the precise question at issue. This Court finds that, from the language of the statute, it is unclear whether Congress intended to make the preparation of a BA a mandatory precursor to the requirements of Section 7(a)(2), or whether it was only recommending one method "to facilitate" compliance with the requirements of that section.

In response to the second question posed by the *Chevron* Court, this Court concludes that Defendants' interpretation of section 7(c)(1) is based on a permissible construction of the statute. Furthermore, "the latitude the ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes that we owe some degree of deference to the Secretary's reasonable interpretation." *Babbitt v.*

298

*Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 703, 132 L. Ed. 2d 597, 115 S. Ct. 2407 (1995) (citing Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 373 (1986)). This deference holds especially true in this situation where Plaintiffs' challenge is to the Secretary's choice of the procedure to enforce the ESA.

### 5. Section 7(a)(2) Claims

Plaintiffs allege that Defendants have committed several violations of their obligations under Section 7(a)(2) of the ESA. This section provides in pertinent part:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical, unless such agency has been granted an exemption for such action . . . .

16 U.S.C. § 1536(a)(2). Section 7(a)(2) "imposes on an agency a duty to 'insure' that any action it takes is 'not likely to jeopardize the continued existence' of a species." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1993) (quoting *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1449 (9th Cir. 1989)). An action "jeopardize[s] the continued existence of' a species where it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Courts have found an agency in violation of Section 7(a)(2) for failing to satisfy either its procedural or substantive obligations under Section 7. *See, e.g., Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1993); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).

### a. The Tree Boa

By engaging in timely informal consultation, *see supra* section 4, defendants FEMA and the FWS have satisfied certain *procedural* obligations under Section 7(a)(2) to the Tree Boa. Still, Plaintiffs allege that Defendants have violated their *substantive* obligations under Section 7(a)(2) as well. Specifically, they argue that the Department of the Interior ("DOI"), through its subsidiary, the FWS, violated its *substantive* obligations by arbitrarily and capriciously concluding that the Estate Nazareth housing project "was 'not likely to adversely affect [the Tree Boa].'" Pls.' Compl. I ¶ 51(b). They also argue that FEMA violated its *substantive* obligations by relying on the FWS's opinion despite providing that agency with inaccurate information during consultation and failing to provide that agency with the "best scientific and commercial data available." In addition, Plaintiffs argue that FEMA violated its *procedural* obligations by failing to reinitiate consultation with the FWS.[25]

This Court will not "upset an agency's assessment of its obligations under section [Seven] unless [it] determine[s] it to be arbitrary and capricious." *Id.* (citing *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990)). Thus, "the issue for review is whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459 (9th Cir. 1984).

Plaintiffs cannot succeed on their claim against the DOI and the FWS. The claim is similar to the plaintiff's claim against the Secretary of Commerce ("Secretary") in *Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1993). In *Greenpeace Action*, an environmental organization filed a complaint against the Secretary and the NMFS. The organization alleged violations of the ESA when the Secretary adopted the NMFS's findings after consultation that allowed for an increase in the total allowable catch of pollock, a staple food for the threatened Steller Sea Lion ("Sea

---

[25] Plaintiffs' Complaint alleges that "the construction and operation of the proposed housing project will jeopardize the continued existence of the [Tree Boa]." Pls.' Compl. I ¶ 47. This Court will construe Plaintiffs' Complaint liberally to allege that Defendant FEMA has violated its general duty to "insure' that its actions were not likely to jeopardize the continued existence of the Tree Boa.

Lion"). The organization objected to, among other things, the Secretary's conclusion that the increase in the total allowable catch of pollock did not "jeopardize the continued existence of" the Sea Lion. *Id.* at 1328-29. The court, however, refused to find that the Secretary's conclusion was arbitrary and capricious. The court reasoned that the Secretary had "acted within his discretion in choosing the data on which to rely and adequately supported his conclusion that the management measures would mitigate any potential harm to the [Sea Lion] caused by pollock fishing." *Id.* at 1336.

Similarly, in the immediate case, the FWS acted within its discretion when it chose the information on which it relied in conducting informal consultation. This information included excerpts from the draft EA, the Tree Boa Mitigation Plan, and various texts and articles on the Tree Boa, including some articles authored by Dr. Nellis and Dr. Tolson. A.R. 17; Cert. of James P. Oland ¶ 4 (June 20, 1996). Furthermore, it adequately supported its conclusion that the project was "not likely to adversely affect" the Tree Boa when it stated that a primary reason for its determination was that a description of the site revealed that it was already highly disturbed and partially cleared. A.R. 17.[26]

■ The FWS also placed several limitations on its decision to conclude consultation. It required the implementation of the Tree Boa Mitigation Plan. *Id.* It also required FEMA to reinitiate consultation "if modifications are made or if additional information becomes available concerning listed species." *Id.* These limitations served to narrow further the scope of the FWS's conclusion, thereby making it unlikely that it made an error in judgment in reaching its determination, let alone a clear error. Accordingly, this Court finds that the FWS's determination was not arbitrary or capricious.[27]

---

[26] Oland and Dr. Magdych had approximately three telephone conversations concerning consultation on the Tree Boa. Tr. of Aug. 1986 Hearing, Vol. 2 at 391-95.

[27] In *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), the United States Court of Appeals for the Ninth Circuit held that the FWS violated Section 7(a)(2) by failing to prepare a comprehensive biological opinion based on the best available data. 848 F.2d at 1453-54. *Connor* is distinguishable from the immediate case. In *Connor*, the court found that the FWS violated the ESA because it failed to prepare a comprehensive biological opinion

Plaintiffs' claims that FEMA violated its *substantive* obligations under Section 7(a)(2) requires a different analysis. Their first argument stems from their contention that FEMA deliberately misled the FWS when, during consultation, it (1) described the site of the Project as being "disturbed" and "lacking established woodland vegetation" and (2) estimated the length of the "temporary" Project as being "approximately six months."[28] Plaintiffs further argue that, in light of its misrepresentation of material information to the FWS, FEMA was not justified in relying on the FWS's opinion.

"Consulting with the [Service] alone does not satisfy an agency's duty under the Endangered Species Act." *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994) (citing *Pyramid Lake*, 898 F.2d at 1415). The agency must still establish conclusively its compliance with Section 7(a)(2)'s *substantive* obligations. *See Pyramid Lake*, 898 F.2d at 1415. "A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decisions to rely on a FWS biological opinion must not have been arbitrary or capricious." *Id.* Where an agency selectively withholds information and, thus, fails to provide the Service with "all" of the best scientific and commercial data available, the agency's reliance on the Service's opinion will not be justified. *See Resources, Ltd. Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1993).

 Defendants have not demonstrated that FEMA selectively withheld any information from the FWS during informal consultation. This Court can not conclude that FEMA's description of the project site to the FWS was clearly erroneous. Furthermore, there is no evidence that FEMA altered or withheld information from the FWS on the proposed duration of the Project during consultation.

---

despite its being given the best available evidence. In contrast, Plaintiffs in this case do not dispute that the FWS prepared a comprehensive biological opinion. Rather, they dispute the FWS's decision to rely solely on the information provided by FEMA. As stated above, this Court finds that the FWS was not arbitrary and capricious in relying on the information provided by FEMA. Furthermore, the merits of this type of argument is questionable given that the "information requirement is a Federal agency responsibility—not an obligation of the Service." 51 Fed. Reg. 19950-51 (1986).

[28] Plaintiffs actually raised this argument for the first time in their Reply Memorandum in Support of Cross-Motion for Summary Judgment. Defendants had no opportunity to address it until oral argument on the Cross Motions for Summary Judgment.

Accordingly, this Court finds that FEMA was entitled to rely on the conclusion of the FWS.

Plaintiffs' second argument stems from their contention that FEMA failed to provide the FWS with the "best scientific and commercial data available" during consultation. "In fulfilling its duty, the agency 'shall use the best scientific and commercial data available.'" *Greenpeace Action*, 14 F.3d at 1336 (quoting 16 U.S.C. § 1536(a)(2)). "When an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.'" *Id.* (quoting *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984)).

■ Plaintiffs argue that FEMA had an obligation to consult personally with Dr. Peter Tolson and Dr. David Nellis, the two leading experts on the Tree Boa, in fulfilling its obligations under the ESA to use the "best scientific and commercial data available." Although FEMA did not consult with Dr. Tolson and Dr. Nellis, it is owed deference in selecting the information on which it will rely during consultation. This information included one of Dr. Tolson's publications, as well as previous EA's from neighboring sites, input from local and federal environmental agencies, and site surveys. *See* A.R. 24 §§ 3.1, 5.0. Accordingly, this Court can not conclude that FEMA acted in an arbitrary and capricious manner in fulfilling its duty to use the "best scientific and commercial data available."[29]

Plaintiffs' final argument states that FEMA violated its Section 7(a)(2) *procedural* obligations by failing to reinitiate consultation with the FWS.[30] "Under Section 7, new circumstances may require

---

[29] As a side note, the Court raises the question of the extentthat "the best scientific and commercial data available" requirement applies to "informal consultation." The language of the ESA implies that it applies to all consultation between the agency and the Secretary. *See* 16 U.S.C. § 1536(a)(2). Still, only the regulation for "formal consultation" explicitly requires the use of "the best scientific and commercial data available". *See* 50 C.F.R. § 402.14(d). The regulation for "informal consultation" makes no mention of such a requirement.*See* 50 C.F.R. § 402.13. Reason would indicate, however, that "the best scientific and commercial data available" requirement applies to both informal and formal consultation.

[30] Plaintiffs raised the argument for reinitiation of consultation for the first time in their *Reply Memorandum in Support of Cross-Motion for Summary Judgment.* This

reinitiation of . . . consultation." *Mount Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1450 (9th Cir. 1992). Regulations provide that "reinitiation of consultation is required and shall be requested by the Federal agency: . . . (b) if new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered; [or] (c) if the identified action is subsequently modified in a manner that causes an effect to listed species . . . that was not considered in the [Service's determination] . . . ." 50 C.F.R. § 402.16.

Although the broad language of 50 C.F.R. § 402.16 may give a different impression, the standard for demonstrating that an agency was arbitrary and capricious in failing to reinitiate consultation is an exacting one. For example, in *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987), the Ninth Circuit held that the Army Corps of Engineers ("COE") violated the ESA by failing to reinitiate consultation after learning that pivotal mitigation efforts to protect two species of endangered birds which it planned to implement had been delayed and were not certain to occur. However, the court limited its holding, stating:

"We do not hold that every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation. The circumstances here go far beyond the problems and doubts associated with any large endeavor. The creation and management of a refuge for the birds is the most important of many modifications the [FWS] considered absolutely necessary to insure that the project was not likely to jeopardize their continued existence."

*Id.* at 1388. Of importance also is the fact that the COE refused the FWS's request to reinitiate consultation. *Id.* at 1386.

Plaintiffs' argument centers around FEMA's decision to extend unilaterally the maximum duration of the Project from six months

permitted Defendants only one chance, oral argument, to respond. At oral argument, Defendants stated that Plaintiffs' claim for reinitiation of consultation was arguably barred because it was not mentioned in either of their two Complaints or notice letters given under the citizen suit provision of the ESA. Defendants declined to object to the claim on these grounds, choosing instead to defeat it on its merits. *See* Transcript of Hearing October 31, 1997 at 28-29. The parties have provided little argument about this claim.

to eighteen months after it conducted informal consultation with the FWS. Plaintiffs contend that this "new information" or "modification" required FEMA to reinitiate consultation. FEMA argues that the alleged "modification" to the duration of the Project or "new information" was relatively inconsequential because "the fundamental premise of the project hasn't changed[;] . . . [it is] still . . . a temporary housing project." *See* Transcript of Hearing October 31, 1997 at 27. Accordingly, it contends that any further consultation is unnecessary.[31]

■ This Court can not conclude that FEMA violated its *procedural* obligations by failing to reinitiate consultation with the FWS. First, even if the incremental change in the length of the Project from six to eighteen months is considered "new information," Plaintiffs have failed to present any evidence showing that this new information "may affect" the Tree Boa. Second, it is not readily apparent that the FWS considered the "temporary" nature of the Project important in reaching its determination that the action was not likely to jeopardize the Tree Boas' continued existence. No where in the determination letter does it mention that the duration of the Project weighed into its decision. *See* A.R. 17. Third, even if the FWS considered the "temporary" nature of the Project important in reaching its determination, FEMA has not changed the Project's designation as a "temporary" measure; it has only altered its duration. Fourth, the FWS never requested that FEMA reinitiate consultation. For all of the foregoing reasons, this Court can not

---

[31] The regulation guiding reinitiation of consultation is entitled "Reinitiation of *formal* consultation." 50 C.F.R. § 402.16 (emphasis added). The Court concludes, however, that the same regulation applies to cases involving informal consultation as well. First, the letters from the FWS and the NMFS concluding informal consultation say as much. *See* A.R. 17 (stating that consultation should be reinitiated "if modifications are made or if additional information becomes available concerning listed species"); A.R. 72 (stating that "consultation should be reinitiated, however, if new information reveals impacts of the identified activity that may affect listed species, a new species is listed, new critical habitat is designated, or the activity is subsequently modified"). Second, given that informal consultation possesses less procedural safety precautions than formal consultation, immunizing conclusions reached after informal consultation from potential reinitiation seems completely illogical.

conclude that FEMA acted in an arbitrary and capricious manner by failing to reinitiate consultation.[32]

### b. The Sea Turtles

Plaintiffs allege that Defendants have committed several violations of their *substantive* and *procedural* obligations under Section 7(a)(2) as to the Sea Turtles. Many of these claims mirror those asserted against Defendants concerning their obligations to the Tree Boa. Realizing that extensive analysis of the claims would be repetitive and unnecessary, this Court will spend substantially less time dealing with these claims than it did with the claims concerning the Tree Boa.

■ Plaintiffs claim that the NMFS's determination that the Project was "unlikely to adversely affect" the Sea Turtles violated its obligations under Section 7(a)(2) because it failed to utilize the best evidence available. Complaint II ¶ 56. They, however, fail to specify what evidence the NMFS did not utilize. In the meantime, the NMFS relied on the data provided by FEMA in its final EA. Furthermore, it adequately supported its conclusion that the Project was "unlikely to adversely affect" the Sea Turtles. A.R. 72. Accordingly, this Court does not find that the NMFS's conclusion was arbitrary and capricious.

■ Plaintiffs also claims that FEMA's failure to reinitiate consultation as to the Sea Turtles was arbitrary and capricious in light of "new information" concerning drastic increases in sewage and sediment runoff as a result of the Project.[33] Given the NMFS's prior conclusion that "sea turtles rarely, if ever, occur in the inner bay area," Letter from Andrew J. Kemmerer, NMFS, to Dr. Bill Magdych, FEMA, (June 26, 1996), it was reasonable for FEMA to conclude that this "new information" does not reveal effects of the action that may affect listed species in a manner or to an extent not

---

[32] FEMA has recently voluntarily reinitiated informal consultation with the FWS. *See* footnote 13, *supra*.

[33] Plaintiffs raised this argument for the first time in its Reply Memorandum in Support of Cross-Motion for Summary Judgment.

previously considered. Therefore, FEMA's failure to reinitiate consultation can not be considered arbitrary and capricious.[34]

The Court will now focus on two new Section 7 arguments raised by Plaintiffs with regards to the Sea Turtles. Plaintiffs' claim that the DOI, and its subsidiary, the FWS, violated Section 7 of the ESA by failing to advise FEMA that the Sea Turtles may be present at the site of the Project. Complaint II ¶ 41. The Court notes, however, that since the alleged harm occurred in Vessup Bay, jurisdiction over the Sea Turtles in this matter rests with the Secretary of Commerce and the NMFS. *See Hawksbill Sea Turtle*, 126 F.3d at 470-71. Accordingly, Plaintiffs can not prevail in their claim against the DOI and the FWS.

Plaintiffs also claim that FEMA violated its *procedural* obligations under section 7(a)(2) when it failed to contact and consult with the NMFS prior to the construction of the housing project. Complaint II ¶ 44. Although FEMA arguably violated the Section 7(c)(1) ESA by failing to contact the NMFS prior to the beginning of construction to determine if any endangered or threatened species "may be present" in the area of the proposed action, the Court need not spend much time discussing this alleged violation.[35] FEMA has ultimately brought itself in compliance by initiating and completing informal consultation as to the Sea Turtles. Although this consultation did occur over seven months after Defendants had commenced construction on the Project, it occurred long before Plaintiffs provided the statutorily required notice to institute their lawsuit. Given that the purpose of the notice requirement is to give the violator an opportunity to bring itself in compliance with the ESA, *see Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 107 L. Ed. 2d 237, 110 S. Ct. 304 (1989); *Public Interest Research Group of New Jersey, Inc. v Hercules, Inc.*, 50 F.3d 1239, 1249

---

[34] FEMA has recently voluntarily reinitiated informal consultation with the NMFS. *See* footnote 13, *supra*.

[35] The Court is skeptical of FEMA's argument that it did not have to contact the NMFS since it determined that the Project was unlikely to affect the environment of Vessup Bay. Regardless of FEMA's determination, the ESA still mandates that FEMA should have contacted the NMFS prior to construction to determine if any endangered or threatened species were present in the area of the Project so that proper consultation could be conducted with regard to those species. FEMA ultimately engaged in proper consultation with regard to the Sea Turtles.

(3d Cir. 1995) and FEMA successfully did so before the notice period expired, this Court can not find FEMA in violation of its Section 7(a)(2) obligations for failing to consult with the NMFS.

## B. SECTION 9 CLAIMS

Plaintiffs allege that Defendants violated Section 9 of the ESA. Section 9(a)(1)(B) makes it a violation for any person to "take" any endangered species. The provision has been extended to "threatened" species as well. 50 C.F.R. § 17.31(a). The term "take" is defined to mean "harass, harm, pursue, shoot, wound, kill, trap, capture, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Federal regulations define "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "For there to be 'harm' under the ESA, there must be actual injury to the listed species. Accordingly, courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species." *American Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir. 1993).

 Although federal regulations define "harm" as "an act which actually kills or injures wildlife," injunctive relief may issue under Section 9 where a plaintiff makes a claim of future harm. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996), *cert. denied*, 136 L. Ed. 2d 831, 117 S. Ct. 942 (1997); *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784-85 (9th Cir. 1995); *see also American Bald Eagle*, 9 F.3d at 166 ("Accordingly, courts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued *will* actually, as opposed to potentially, cause harm to the species." (emphasis added)). Still, in cases claiming future harm, issuance of injunctive relief requires a petitioner to prove a "reasonably certain threat of imminent harm to a protected species." *Marbled Murrelet*, 83 F.3d at 1066 (citing *Rosboro*, 50 F.3d at 786; *National Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994); *American Bald Eagle*, 9 F.3d at 166). "Mere speculation" is not sufficient.

308

*National Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994).

### 1. The Tree Boa

Plaintiffs' arguments and evidence point primarily to three ways in which the Project has or will "harm" the Tree Boa: (1) the construction of the Project, including site clearing activities, has killed and injured Tree Boas located on the construction site; (2) the continued operation of the Project will lead to the increased exposure of the Tree Boa to humans and feral predators that will kill or injure the species; and (3) the Project has modified and degraded the Tree Boa's habitat in a way that is adversely affecting its feeding and sheltering patterns. Defendants have presented little evidence in opposition. Rather, they argue that the evidence produced by Plaintiffs' is insufficient to meet the substantial requirements necessary to establish a "taking" of the Tree Boa. After much consideration, this Court finds itself in agreement with Defendants.

Plaintiffs' first argument that the construction of the Project has killed and injured Tree Boas located on the site is easily discredited. In support of this argument, they rely solely on Dr. Tolson unsupported conclusion that Tree Boas were present on the project site during construction. Plaintiffs have failed to present any direct or circumstantial evidence establishing the presence of the Tree Boas on the site at the time it was cleared or during construction. They have also failed to produce any direct evidence that the acts of clearing the site or constructing the Project actually killed or injured a Tree Boa. Plaintiffs' argument must fail. *See Morrill v. Lujan* , 802 F. Supp. 424, 430 (S.D. Ala. 1992) (similar argument failing because there was no conclusive evidence that endangered species existed on property where construction was to occur).

Plaintiffs' second argument, that continued operation of the Project *will* harm the Tree Boa by increasing its exposure to humans and feral predators also fails. The "imminence" of the harm is not at issue here since the Project has already been approved and site clearance has begun. *See Rosboro*, 50 F.3d at 788. What is at issue, however, is whether Plaintiff has proved that the harm described is reasonably certain to occur to the Tree Boa. In making their argument, Plaintiffs once again rely on Dr. Tolson. Dr. Tolson states

that "inevitably" Tree Boas will migrate onto the project site seeking shelter and will become more visible to the human occupants, whose "inevitable" reaction upon seeing the animals will be to attempt to injure or kill them. *Id.* ¶¶ 32-34. Dr. Tolson also states that feral predators, such as cats, dogs, mongoose, and rats, will be attracted to the project site by the presence and smell of food and will then venture into the remaining habitat that surrounds the Project and injure or kill Tree Boas. *Id.* ¶¶ 36-38.

The Court credits Dr. Tolson's experience with respect to the Tree Boa. Still, it finds that the assumptions underlying his opinion are unsupported. He does not cite any studies or other evidence to support his assumptions that (1) Tree Boas will migrate onto the project site to seek shelter, and (2) humans will react to the sight of the animals by attempting to injure or kill them. He also does not cite any studies or other evidence to support his assumptions that (1) the Project will attract feral predators, and (2) that the introduction of these feral predators into the Project will lead to Tree Boa deaths and injuries. Without this support, Plaintiffs have failed to prove to this Court's satisfaction that the Project is reasonably certain to harm the Tree Boa. *See Morrill*, 802 F. Supp. at 431 (rejecting similar arguments on the grounds that plaintiffs failed to prove a factual basis on which to establish the requisite causal link between construction project and factors theorized to pose a potential for a "take").

Plaintiffs' third argument is that the Project has modified and degraded the Tree Boa's habitat in a way that is adversely and significantly impacting its feeding and sheltering patterns. As stated above, the definition of "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. The preamble to the final rule states:

> Although some of the comments specifically argued that habitat modification alone is a prohibited taking under section 9, in the opinion of the Service, Congress expressed no such intent.
> The final definition adds the word "actually" before the words "kills or injures" in response to comments request-

310

ing this addition to clarify that a standard of actual, adverse effects applies to section 9 takings. . . .

In response to the broad misperception of the intent of the rule, an additional sentence has been added which is similar to the original definition's language. This additional language makes it clear that habitat modification or degradation, standing alone, is not a taking pursuant to section 9. To be subject to section 9, the modification or degradation must be significant, must significantly impair essential behavioral patterns, and *must result in actual injury to a protected wildlife species*. The word "impair" was substituted for "disrupt" to limit harm to situations where a behavioral pattern was adversely affected and not simply disturbed on a temporary basis with no consequent injury to the protected species.

46 Fed. Reg. 54750 (1981) (emphasis added). Therefore, to prove a "take" as a result of habitat modification, a plaintiff must prove that (1) an act results in significant habitat modification or degradation, (2) that modification or degradation causes significant impairment of the species' essential behavioral patterns, and (3) that significant impairment actually kills or injures wildlife. *Cf. Babbitt*, 515 U.S. at 713 (O'Connor, J., concurring) (stating that "the 'harm' regulation applies where significant habitat modification, by impairing essential behaviors, proximately (foreseeably) causes actual death or injury to identifiable animals that are protected under the Endangered Species Act").

Plaintiffs again rely on the affidavit of Dr. Tolson in making their argument. Dr. Tolson concludes that "the site clearing and continued development of [the Project] has demonstratively adversely affected feeding and sheltering patterns of the [Tree Boa] as a result of the modification and degradation of its habitat." Supp. Aff. of Dr. Peter Tolson ¶ 24. Defendants do not dispute that the construction of the Project resulted in significant modification to Tree Boa habitat.[36] Rather, they argue that Plaintiffs have failed to make the requisite showing of actual injury or harm as a result of the modification of the Tree Boa's habitat.

---

[36] They do, however, refer to the habitat as "potential" rather than "actual" Tree Boa habitat.

■ This Court agrees with Defendants' argument. Plaintiffs have provided no direct evidence that Tree Boas have died or been injured as a result of changes in their feeding and sheltering patterns.[37] Furthermore, they provide no evidence of any general decline in the population of the Tree Boa. *See Sierra Club v. Yeutter*, 926 F.2d 429, 438-39 (5th Cir 1991). Plaintiffs do document a marked increase in Tree Boa sightings and injuries in the area surrounding the Project. Supp. Aff. of Dr. Peter Tolson ¶¶ 24, 25. Specifically, they note that two of the six sightings were of injured or dead tree boas. *Id.* ¶ 26. Plaintiffs, however, provide insufficient evidence to establish a causal relationship between the habitat modification caused by the Project and the actual harm to these two Tree Boas.

### 2. The Sea Turtles

Plaintiffs also state a Section 9 claim pertaining to the Sea Turtles. They argue that the Project has or will modify and degrade the Sea Turtles' habitat in a way that is adversely affecting its feeding and sheltering patterns by causing increased discharge of partially treated sewage effluent and sediment runoff into Vessup Bay. In support of this "takings" argument, Plaintiffs have presented affidavits and testimony from Dr. Teresa Turner, Dr. Joshua Sladek Nowlis, and Dr. James P. Beets. These biologists conclude that the runoff and sewage from the Project will kill sponges, the primary food source of the Hawksbill Sea Turtle, and Turtle Grass beds, the primary food source of the Green Sea Turtle.

Still, the Court can not conclude that Defendants actions have amounted to a taking since none of Plaintiffs' extra-record materials meets the high standard of showing actual harm to the Sea Turtles as a result of the habitat modification. To establish a Section 9 "taking" resulting from habitat modification requires plaintiffs to make a showing of "significant habitat modification that causes actual, as opposed to hypothetical or speculative, death or injury to identifiable protected animals." *Babbitt*, 515 U.S. at 708-09 (O'Connor, J., concurring). Plaintiffs have failed to provide evi-

---

[37] The Court also does not find injunctive relief is warranted since Plaintiffs have failed to prove to this Court's satisfaction a "reasonably certain threat of imminent harm" to the Tree Boa as a result of any impacts to its feeding and sheltering patterns.

312

dence of one dead or injured Sea Turtle, or studies documenting the general decline in the population since the onset of the Project.

█ The Court also does not find injunctive relief is warranted since Plaintiffs have failed to demonstrate a "reasonably certain threat of imminent harm" to the Sea Turtles. None of Plaintiffs' experts have testified that the Project is reasonably certain to harm the Sea Turtles. Furthermore, Plaintiffs have failed to show that the sponges and sea grasses located in Vessup Bay are the only food source for the Sea Turtles or that the Sea Turtles are food limited species. Accordingly, even if the Court were to find that the Project was killing Turtle Grass or sponges, a conclusion that the Project would have any effect on Sea Turtle populations would be speculative since Sea Turtles might be able to seek food somewhere else other than Vessup Bay. Although the Court finds the affidavits and testimony concerning the damaging effects to Vessup Bay compelling, because Plaintiffs have failed to produce sufficient evidence to meet the requisite standard, it can not grant them the extraordinary injunctive relief that they seek.

## III. CONCLUSION

The Court will enter an appropriate order granting judgment for Defendants.

It is on this 2nd day of July, 1998 HEREBY

ORDERED that the Plaintiffs' Motion to Strike Defendants' Exhibit 22 and Motion to Strike Defendants' Exhibit 23 are DE-NIED AS MOOT; and it is further

ORDERED that National Wildlife Motion for Leave to Submit Brief Amicus Curiae is DENIED; and it is further

ORDERED that the Plaintiffs' Objection to Magistrate's Order Precluding Discovery is DENIED; and it is further

ORDERED that Plaintiffs' Applications for Permanent Injunctive Relief and Declaratory Relief are DENIED and that Judgment is hereby entered in favor of Defendants; and it is further

ORDERED that both the Plaintiffs' and Defendants Cross Motions for Summary Judgment are DENIED AS MOOT; and it is further

ORDERED that the Plaintiffs' Renewed Motions for Summary Judgment are DENIED AS MOOT; and it is further

ORDERED that this Court will continue to maintain jurisdiction.